CHEMUNG CANAL TRUST COMPANY et al., as Trustees under the Will of GRACE DOOLITTLE, Deceased, Respondents, *v.* MONTGOMERY WARD & CO., Incorporated, Appellant; FRANK COLLIER et al., Respondents, et al., Defendants.

Third Department, May 15, 1957.

*Charles B. Swartwood* for appellant.

*William E. Palmer* for Chemung Canal Trust Company and others, respondents.

*Harry Treinin* for Frank Collier and another, respondents.

HALPERN, J. We have before us for construction in this case the provisions of a lease which both sides agree cannot be read literally. On September 25, 1937, Frank E. Doolittle and Elsie, his wife, let to the defendant-appellant Montgomery Ward & Co., Incorporated, certain premises in the city of Elmira for a term of 15 years, commencing on April 1, 1940, with a provision for successive renewals for two additional periods of 10 years each. The term of the lease was extended by renewal to March 31, 1965. Upon the death of the lessors, the property passed to Grace Doolittle and, upon her death, it passed to the plaintiffs as trustees under her will.

The lease provided for an annual fixed rental of $15,000 payable monthly and, in addition, certain percentage rent, to be determined in accordance with paragraph 22 of the lease which read, in part, as follows: " In addition to the fixed rent provided in Section 2 hereof, Montgomery Ward & Co., Incorporated, shall pay a percentage rent equal to two and one-half per cent (2½%) of the gross retail sales (less exchanges, allowances, returns, mail order sales and sales taxes) made by it on the premises during each lease year in excess of an annual basic sales total of Six Hundred Thousand Dollars ($600,000). The amount of such basic sales total shall apply pro rata for any period less than a lease year. Payments of percentage rent shall be made within sixty (60) days after the expiration of the period for which made."

The " lease year " under the agreement ran from April 1 of each year to March 31 of the following year. The lease provided that " Payments of percentage rent shall be made within sixty (60) days after the expiration of the period for which made ". The percentage rent was therefore payable on or before May 30 of each year, beginning with May 30, 1941.

Under paragraph 13 of the lease, the tenant was given the right to sublet the premises, or any part of them, or to assign the lease and to cease carrying on the sale of merchandise at retail upon the premises. Prior to December 24, 1954, the defendant-appellant assigned the lease and on that date it ceased to do business on the premises. Paragraph 22 of the lease contained a provision as the method of computing the additional rental to be paid in the future in the event of a cessation of business. The meaning of that provision is the principal subject of the controversy between the parties. The provision read: " Should Montgomery Ward & Co., Incorporated, vacate the entire premises or cease selling merchandise at retail therein while the premises are usable for the operation of a store or should it assign this lease or sublet all of the premises to anyone except a successor or a subsidiary or controlling corporation, then the average monthly percentage rental paid during the twenty-four (24) months or lesser period of occupancy preceding such event shall be taken as the monthly rate of percentage rental payable thereafter, subject to abatement as elsewhere provided."

The plaintiffs-respondents contend that, under this provision, the additional rental to be paid after the date of the cessation of business was to be determined by the percentage rental actually paid (or payable) during the 24 months preceding the date of such cessation. As applied to the facts of this case,

the additional rental would be determined on the basis of percentage rental paid (or payable) during the 24-month period from December 25, 1952, to December 24, 1954. Since the percentage rental under the lease was payable 60 days after the expiration of the period for which it was payable, the percentage rental earned during the period from April 1, 1954, to December 24, 1954, the last nine months of the Montgomery Ward occupancy, was not payable until February 22, 1955. Therefore it would be excluded, under plaintiffs' construction of the lease, from the base to be used in the computation of the future additional rental. The average monthly percentage rental to be used as the basis for the future monthly additional rental would be that earned during the lease years April 1, 1952, to March 31, 1953, and April 1, 1953, to March 31, 1954, since those were the two years for which the payment of percentage rental had become due and payable during the 24 months preceding the cessation of the Montgomery Ward business.

The plaintiffs-respondents recognize that, for a variety of reasons, payment might not actually be made at the time called for by the lease and therefore they would substitute the word " payable " or the clause " which should have been paid " for the word " paid " in the lease provision. This point becomes important in connection with another claim of the plaintiffs, to be discussed later, that Montgomery Ward had improperly withheld part of the percentage rental payable for the lease year from April, 1953 to March, 1954, as a deduction for the cost of certain alleged repairs.

The defendant-appellant Montgomery Ward contends that it was intended by the parties that the future additional monthly rental should be determined upon the basis of the last 24 months of Montgomery Ward's experience and that the words " paid during the 24 months " should be construed to mean " paid *for* the last 24 months " or " paid *on account of sales made* during the last 24 months ". Whether the word " payable " is substituted for the word " paid " is not material under this construction, since the time when the payment was due and the time when it was actually made are equally immaterial. The defendant therefore offers no objection to this part of the construction of the lease advanced by the plaintiffs. Under the defendant's construction, the future rental would be determined upon the basis of the average monthly rental paid or payable for the sales made during the period from December 25, 1952, to December 24, 1954, regardless of the time when payment of the rental became due or was actually made.

Since the volume of business of Montgomery Ward had been steadily declining during the last few years of its occupancy, the average monthly percentage rental, computed according to the plaintiffs' construction, was $1,015.56, while, according to the defendant's construction, it was $721.13.

In order to obtain an adjudication of this controversy, as well as the controversy with respect to the deduction for repairs made during the last year, the plaintiffs brought an action for a declaratory judgment. Each party moved for summary judgment upon the basis of the pleadings, the exhibits attached thereto and the affidavits submitted upon the motion and also upon the basis of a stipulated statement of additional facts. The Special Term adopted the plaintiffs' construction of the lease and accordingly granted judgment in favor of the plaintiffs.

We are constrained to reverse this part of the determination. It seems clear to us that it was the intention of the parties to determine the future additional rental, in the event of Montgomery Ward's assigning the lease and vacating the premises, upon the basis of the percentage rental payable upon the sales made during the last 24 months of Montgomery Ward's occupancy.

The fact that the parties described the base period to be used in the computation in terms of months is significant. The percentage rental was payable annually in a single lump sum within 60 days after the end of the lease year, not on a monthly basis. Under the plaintiffs' construction, all that could be taken into account in computing the future additional rental would be the last two annual payments of percentage rental. If the parties had intended that result, they could easily have said so; there would have been no need to refer to the period of 24 months preceding the cessation of business and to provide for the averaging of the percentage rental on a monthly basis. The reference to a period of 24 months indicates that the parties intended to use the experience of Montgomery Ward down to and including the last month of the occupancy, even though that might mean taking a fraction of a lease year, for which the percentage rental was not yet due and payable. Using a 24-month period also involved taking into account a fraction of a year at the beginning of the period, if Montgomery Ward moved out at any time other than the end of a lease year. This gave rise to the need for the provision for averaging the annual percentage rental over the period of months for which it was paid and arriving at a monthly average percentage rental for each of the months falling within

the 24-month period. If it had been intended to take into account only the last two annual payments of percentage rental, a provision could simply have been made for the averaging of those annual payments.

The provision of the lease that, if Montgomery Ward occupied the premises for less than 24 months, the rental for the "lesser period of occupancy" should be taken as the basis for future rental, also supports the defendant's construction. The only meaning which can reasonably be given to this provision is that the rental earned on the sales made during the period of occupancy should be controlling. It could not have been intended that the amount of rental actually paid or payable during the period of occupancy should be controlling, since no percentage rental may have fallen due during that period, or there may have been only a single payment during the period which would not adequately reflect the percentage rental earned during the entire period. Two examples will readily illustrate this: (1) If the cessation of occupancy had occurred in less than 14 months after the commencement of the term, no annual percentage rental would have actually been paid or payable during the period of the occupancy, since the percentage rental was not payable until 60 days after the end of the lease year. Under the plaintiffs' construction, in that case, nothing would be payable by way of additional rental in the future, even though a very substantial amount of percentage rental may have been earned on the basis of the sales during the period of occupancy. (2) If the cessation of the occupancy had occurred more than 14 months but less than 26 months after the commencement of the term, only one annual payment of percentage rental would have been made during the period of occupancy. Only the percentage rental for the first year would have become due during the period of occupancy. It could not have been intended that the percentage earned on the sales made during the rest of the period of occupancy should be disregarded in computing the future monthly additional rental, merely because payment had not been made during the period of occupancy.

Even after Montgomery Ward had been in occupancy for more than two years, equally unreasonable results might follow under the plaintiffs' construction of the lease. Under the lease, Montgomery Ward had the right to pay the percentage rental at any time within a period of 60 days after the end of the lease year, that is to say, at any time between April 1 and May 30 of the following year. Montgomery Ward might

pay the percentage rental on May 1 of one year and on May 30 of the second year and then cease doing business on the premises on May 15 of the third year, prior to its payment of percentage rental for the preceding lease year. In that case, only one annual payment of percentage rental would have been made during the period of 24 months preceding the cessation of business and, under the plaintiffs' construction, that single payment would be the total amount of percentage rental to be averaged over the period of 24 months for the purpose of determining the future additional monthly rental.

It is hornbook law that a construction of a contract which produces unreasonable results should be avoided, if possible, and that a more reasonable construction should be sought (*Fleischman* v. *Furgueson,* 223 N. Y. 235, 241; Restatement, Contracts, § 236, subd. [a]).

The reasonable construction called for under the circumstances may be found, if the words '' paid during '' in the lease are construed to mean '' paid for '' or '' paid on account of '' the 24 months' period so that the provision would read that '' the average monthly percentage rental paid *for or on account of* the 24 months or lesser period of occupancy preceding such event shall be taken as the monthly rate of percentage rental payable thereafter ''. Then, regardless of the time when the percentage rental was actually paid or payable and regardless of the date on which the cessation of business happened to occur, the future additional rental would be based upon the percentage rental earned during the full period of the last 24 months, or the lesser period of occupancy, immediately preceding the cessation of business.

We ought not to shrink from giving the word '' during '' in the context of the provision in controversy the meaning of '' for '' or '' on account of '', even though this may not be the dictionary meaning of the word, if it carries out the manifest intention of the parties.

As the Court of Appeals said in *Spencer* v. *Childs* (1 N Y 2d 103, 106–107): '' Cases such as the present * * * well illustrate the aptness of Judge Learned Hand's wise and trenchant observation that courts should be wary of making ' a fortress out of the dictionary ', since there ' is no more likely way to misapprehend the meaning of language * * * than to read the words literally, forgetting the object which the document as a whole ' seeks to achieve. (*Cabell* v. *Markham,* 148 F. 2d 737, 739; *Central Hanover Bank & Trust Co.* v. *Commissioner,* 159 F. 2d 167, 169.) ''

Moreover, even if we give the word " during " its ordinary dictionary meaning and leave it undisturbed in the text, the same result may be reached by interposing the words " on account of sales made " between the words " paid " and " during " so that the provision would read " the average monthly percentage rental paid *on account of sales made* during the 24 months or lesser period of occupancy preceding such event shall be taken as the monthly rate of percentage rental payable thereafter ". This construction treats the provision as an elliptical expression of the intention of the parties; all that we do in the process of construction is restore the words elliptically omitted. This construction of the provision is supported by the provision of paragraph 22 specifying the basic method of computing the percentage rental. The provision requires Montgomery Ward to " pay a percentage rent * * * of the gross retail *sales* * * * *made* by it on the premises *during* each lease year ". In the same paragraph, there is a reference to the percentage rent being payable " within sixty days after the expiration of the period *for which made* ". The emphasis is upon the period *for which* the payment is made, and upon the *sales made during* that period, not upon the period during which the payment is actually made. In a supplemental agreement, there is a reference to the percentage rental *earned*. (Italics added.) All these provisions support the view that it was the percentage rental earned upon the sales made during the 24-month period, and not the amount of the payments which happened to be made during that period, which the parties intended to be controlling.

That the construction here adopted happens to work out in favor of Montgomery Ward in this case is a purely accidental circumstance of no signficance. At the time of drafting the lease, the parties could not have known whether in the years immediately preceding an assignment, the volume of business would be on the ascendant or would be declining. An assignment of the lease would not necessarily indicate that the volume of business had been going down; an assignment might be made during a period of increasing prosperity, because Montgomery Ward had decided to move to a more desirable location or had erected a new building of its own or because it had found a new tenant willing to pay a substantial profit for an assignment of the lease. In any event, there is no reason to assume that the parties intended arbitrarily to exclude the experience of the last year or a part thereof in the computation of the future additional rental.

The remaining controversy between the parties relates to a deduction made by Montgomery Ward from the percentage rental payable by it for the lease year ending March 31, 1954, allegedly for the cost of repairs made upon the premises of a subtenant. As has been noted above, Montgomery Ward was authorized to sublet the premises. In drafting the lease, the parties must have recognized that the sales made by the subtenant could not, as a practical matter, fairly be included in Montgomery Ward's sales for the purpose of computing the percentage rental of $2\frac{1}{2}\%$, since it could not be known in advance what the nature of the subtenant's business would be and whether $2\frac{1}{2}\%$ would be an appropriate percentage rental for the sales of the subtenant. However, the amount of the rental paid by the subtenant to Montgomery Ward would presumably reflect a fair percentage of the subtenant's sales properly chargeable as rental. The lease provided an intricate method of taking this rental into account. In substance, it was provided that the amount of the rent received by Montgomery Ward from the subtenant '' less the cost of commissions, heat, light, janitor and elevator service, and alterations, decorations, repairs and other expenses incident to such subletting '' was to be multiplied by $33\frac{1}{3}$ and the product was then to be added to the amount of Montgomery Ward's sales, in determining the base upon which the percentage rental was to be computed.

A portion of the premises was sublet to a furniture company at $18,000 per year. In computing the percentage rental for the lease year ending March 31, 1954, Montgomery Ward deducted from the rental received from the furniture company the sum of $1,037.50 for repairs made upon the portion of the premises occupied by the subtenant, before multiplying the rental by $33\frac{1}{3}$ and applying the $2\frac{1}{2}\%$ percentage to the product. This had the effect of reducing the percentage rental payable for the lease year by the sum of $864.58.

The plaintiffs contend that the deduction was improper. Under the original lease, the tenant was responsible for '' repairs and replacements made necessary by its negligence '' with certain exceptions, and the landlord was responsible for all other '' repairs and replacements necessary to put and maintain the premises in a safe, dry and tenantable condition and in good order and repair ''. In 1947, the parties entered into a supplemental agreement under which it was agreed that the tenant Montgomery Ward would '' after this date at its own expense maintain, repair and keep the premises, including elevator, heating plant, and roof, in good serviceable condition

and in consideration thereof, the tenant shall deduct the sum of Fifteen Hundred Dollars ($1500.00) each year from percentage rental earned ". It is the contention of the plaintiffs that the $1,500 allowance to Montgomery Ward covered the repairs made by it for its subtenant and that therefore the deduction of the repair item from the subtenant's rental constituted a double deduction. The plaintiffs therefore maintain (1) that the defendant should be required to pay an additional sum for percentage rental for the lease year ending March 31, 1954, and (2) that in computing the future additional rental, the percentage rental which should have been paid by Montgomery Ward for that year should be taken into account, rather than the amount which it actually paid.

Despite the fact that it submitted voluminous affidavits upon the motion for summary judgment, Montgomery Ward offered no information as to the nature of the repairs which it alleged it had made for the subtenant. There was no showing that the repairs were not included within the repairs which Montgomery Ward had agreed to make, under the supplementary agreement, in return for the allowance of the lump sum of $1,500 per year. Since Montgomery Ward was seeking a deduction from the amount of its prima facie liability, the burden was upon it to come forward with evidentiary facts which would justify the deduction. In this state of the record, the court below was right in disallowing the deduction. This portion of the order and judgment should be affirmed, both with respect to the recovery by the plaintiffs of an additional percentage rental of $864.58 for the lease year ending May 31, 1954, and with respect to the adjudication of the effect of that additional percentage rental upon the amount of the future additional rental.

The judgment and order appealed from should be modified on the law and the facts, by adjudging and decreeing that the additional percentage rent to be paid by the defendant to the plaintiffs for the remainder of the term after December 24, 1954, should be computed upon the basis of the average monthly percentage rent, paid or payable by Montgomery Ward for or on account of the sales made during the period of 24 months immediately preceding December 24, 1954, and, as so modified, the order and judgment should be affirmed, without costs.

FOSTER, P. J., BERGAN, COON and GIBSON, JJ., concur.

Judgment and order appealed from modified on the law and the facts, by adjudging and decreeing that the additional percentage rent to be paid by the defendant to the plaintiffs for

the remainder of the term after December 24, 1954, be computed upon the basis of the average monthly percentage rent, paid or payable by Montgomery Ward & Co., Inc., for or on account of the sales made during the period of 24 months immediately preceding December 24, 1954, and, as so modified, the order and judgment are affirmed, without costs.

Settle order.