HERBERT J. SCHMIDT, JR., et al., Appellants-Respondents, v MAGNETIC HEAD CORPORATION et al., Respondents-Appellants, et al., Defendants.

Second Department, November 14, 1983

APPEARANCES OF COUNSEL

*Berg & Duffy (James P. Duffy, III, William Cornachio* and *Donald F. Leistman* of counsel), for appellants-respondents.

*Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P. C. (Samuel S. Tripp, John P. Cleary* and *William V. Alesi* of counsel), for respondents-appellants.

*Lovejoy, Wasson, Lundgren & Ashton, P.C.* (*Morton Apfeldorf* and *Martin S. Kaufman* of counsel), *amicus curiae.*

OPINION OF THE COURT

TITONE, J.

 These appeals involve the interpretation and construction of a corporate shareholders' agreement. Our primary concern is with the question of whether plaintiffs are entitled to designate a successor director in the place of their prior designee who has resigned. We are also called upon to determine whether the defendant directors are entitled to indemnification for legal expenses incurred in defending this action and whether the attorneys representing those directors should be disqualified on the basis of an alleged conflict of interest. As we shall explain, the plaintiffs have no right to designate a successor under the unambiguous terms of the agreement, the defendants may be indemnified, and disqualification is inappropriate. In addition, we reject the appealing defendants' challenge to the causes of action seeking reformation, rescission and return of moneys paid for indemnification.

On April 30, 1978, defendant Magnetic Head Corporation acquired MCP Corporation by exchanging 47.5% of its shares for all the shares of MCP. As a result of this transaction, plaintiffs Herbert and Barbara Schmidt, shareholders of MCP, became the owners of 45.8% of Magnetic Head stock, which was the largest shareholder interest in that corporation.

Nonetheless, the Schmidts did not obtain a controlling interest in the new corporate structure. In accordance with the terms of the shareholders' agreement more fully discussed below, the Schmidts and the other shareholders designated James North, the Schmidts' attorney, Charles Rockwell, Magnetic Head's chairman of the board of directors, and Royce McKinley, president of Santa Anita Consolidated, Magnetic Head's largest preacquisition shareholder, as the holders of irrevocable proxies. The proxy holders elected North and the Schmidts to the board of directors as required by this agreement.

On April 30, 1981, North resigned both as a proxy holder and director and Herbert Schmidt thereupon attempted to

designate one James P. Duffy as his successor. Those having a controlling interest in Magnetic Head claimed that Schmidt had no such right, and the remaining seven members of the board of directors refused to elect Duffy to the board. Instead, they chose one Edward Gleason to fill the vacancy.

The shareholders' agreement limits the number of members of the board of directors to nine so long as the Schmidts own at least 30% of Magnetic Head's common stock. The sections of the agreement governing voting rights and successors read as follows:

"3. *Voting Rights.* On the date hereof, each shareholder shall sign an Irrevocable Proxy in the form annexed hereto as Exhibit Z, granting to the Proxy Holders the exclusive right to vote all Shares subject to the provisions of this Shareholders Agreement, or to give written consents in lieu of voting thereon, at their discretion for whatsoever purposes and in any and all proceedings, whether at meetings of the shareholders of the Company or otherwise, wherein the vote or written consent of shareholders of the Company may be required or authorized by law. It is expressly provided that during any period in which Herbert J. Schmidt, Jr. and Barbara B. Schmidt, and their associates are the holders of 30% or more of the common shares of the Company the Proxy Holders shall vote the Shares for the election of Herbert J. Schmidt, Jr., Barbara B. Schmidt and James North for election as directors and for determining the number of directors at not more than nine (9). During any period in which there are three Proxy Holders any action of the Proxy Holders may be exercised by a majority of the Proxy Holders. During any period in which there are only two Proxy Holders any action of the Proxy Holders shall be exercised jointly."

"4. *Successors to the Proxy Holders.* In the event of the resignation, incapacity or death of James North, one of the Proxy Holders, his successor shall be designated by Herbert J. Schmidt, Jr. by an instrument in writing duly acknowledged. In the event of the resignation, incapacity or death of Royce McKinley, one of the Proxy Holders, his successor shall be designated by Santa Anita Consolidated, Inc. by an instrument in writing duly acknowledged. In the

event of the resignation, incapacity or death of Charles S. Rockwell, one of the Proxy Holders, his successor shall be designated by Magnetic Head Corporation by an instrument in writing duly acknowledged. Upon the designation of any successor Proxy Holders, the Shareholders shall sign and deliver to the Proxy Holders a new Irrevocable Proxy appointing the Proxy Holders then qualified to act, including the newly designated Proxy Holder. The rights, powers and privileges of each Proxy Holder shall be possessed by each successor Proxy Holder. In the event any successor named herein fails to accept the position of Proxy Holder or in the absence of the appointment of a successor, the Proxy Holders then acting shall possess all of the right, title and powers of the original Proxy Holders.

"In witness Whereof, the undersigned Shareholders have executed the Agreement and the Proxy Holders, to evidence their respective acceptance of the functions and duties of the Proxy Holders, have executed this Agreement, all as of the date and year first above written."

The other pertinent provisions of the agreement may be more briefly summarized. Section 2 vests the proxy holders with the right to exercise the voting power acquired by the shareholders of Magnetic Head under the acquisition agreement. Section 6 specifies that the agreement's duration is to be at least 5 years but no longer than 10 years. Section 7 authorizes the proxy holders to incur reasonable expenses and employ professional counsel in performance of their duties, which may be charged pro rata to the shareholders. Section 8 provides that each proxy holder is not disqualified from voting for himself to serve as an officer or director of Magnetic Head or any of its subsidiaries. Section 9 sets forth the mode and sufficiency of notice to proxy holders. Finally, section 10 requires that all certificates of stock subject to the shareholders' agreement shall contain a legend indicating that the voting rights of the shareholder represented by the certificates can be exercised only by the holders of the irrevocable proxies appointed under such agreement.[1]

---

1. The remaining sections of the shareholders' agreement, i.e., sections 11 ("Construction"), 12 ("Counterparts"), 13 ("Headings"), 14 ("Amendment"), and 15 ("Binding Effect") have no bearing on the issues before this court.

The Schmidts commenced this action shortly before Gleason was selected to fill North's vacancy on the board. Their complaint, resting upon numerous theories, sought, among other things, to compel Duffy's acceptance as a director.

On a motion to dismiss pursuant to CPLR 3211 (subd [a]), Special Term sustained the causes of action seeking reformation, rescission and return of moneys paid to the defendants for indemnification,[2] but dismissed those for specific performance, construction and breach of the shareholders' agreement. The court perceived no ambiguity in the agreement and, except for the prospect of reformation and rescission, regarded the relief sought to be precluded by the absence of an express provision for the appointment of a successor director. All the litigants but North and his law partners have appealed.

We begin with the causes of action for specific performance, construction of the shareholders' agreement, and a declaration that the agreement has been breached. It is evident that they must stand or fall together inasmuch as they all derive from plaintiffs' claim that the agreement entitled them to select directors. Basically, it is plaintiffs' position that extrinsic evidence should be received because the failure of the agreement to delineate the succession of directors renders it ambiguous, particularly since they claim that they would not have limited their voting rights for up to 10 years without the right to replace North or themselves on the board.

■ The threshold question of whether a writing is ambiguous "is the exclusive province of the court" (*Sutton v East Riv. Sav. Bank*, 55 NY2d 550, 554). Our reading of the shareholders' agreement compels us to conclude that there is simply no ambiguity with respect to the selection of a director in the event of a vacancy on the board (cf. *Hartford Acc. & Ind. Co. v Wesolowski*, 33 NY2d 169, 172). Completely absent is any allusion to the procedure to be em-

---

2. A malpractice claim against North and his law partners was also sustained. Because those defendants have not appealed that question is not now before us.

We also note that the issue before us is properly resolved by motion under CPLR 3211 (subd [a], par 7) (see *805 Third Ave. Co. v M. W. Realty Assoc.*, 58 NY2d 447) and, in any event, by failing to object, the parties are deemed to have acquiesced in this procedure (*Stevenson v News Syndicate Co.*, 302 NY 81, 87; *Ballentine & Sons v Boston Celtics Basketball Club*, 36 AD2d 914).

ployed in the filling of such vacancy. An omission or mistake in a contract does not constitute an ambiguity (see *Gearns v Commercial Cable Co.*, 293 NY 105, 109; *Matter of Rivas' Trust*, 100 NYS2d 357, 365; 4 Williston, Contracts [3d ed], § 619, pp 742-743) and, as Justice LAZER observes in his concurring opinion, the question of whether an ambiguity exists must be ascertained from the face of the agreement without regard to extrinsic evidence (*Breed v Insurance Co. of North Amer.*, 46 NY2d 351, 355; *Facet Inds. v Wright*, 95 AD2d 262, 266).

It is fundamental that courts enforce contracts and do not rewrite them (*Grace v Nappa*, 46 NY2d 560, 565; *Rodolitz v Neptune Paper Prods.*, 22 NY2d 383, 386). "The courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing' " (*Morlee Sales Corp. v Manufacturers Trust Co.*, 9 NY2d 16, 19). As commentators caution, "An obligation undertaken by one of the parties that is intended as a promise or agreement should be expressed as such, and not left to implication" (Mandel, Preparation of Commercial Agreements [1978 ed], pp 12-13).

In construing the provisions of a contract, ascertainment of the intention of the parties is paramount (see, e.g., *Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 400) and due consideration must be given to the purpose of the parties in entering into the contract (*Matter of Cromwell Towers Redevelopment Co. v City of Yonkers*, 41 NY2d 1, 6). Although to carry out that intention, words may be transplanted, supplied, or rejected to make its meaning more clear (*Castellano v State of New York*, 43 NY2d 909, 911), where the intention of the parties is clearly and unambiguously set forth in the agreement itself effect must be given to the intent as indicated by the language used without regard to extrinsic evidence (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.*, 32 NY2d 285). The express "provisions establish the rights of the parties and prevail over conclusory allegations of the complaint" (*805 Third Ave. Co. v M. W. Realty Assoc.*, 58 NY2d 447, 451) and the subjective intent is irrelevant (Mandel, *op. cit.*, p 12).

The acquisition agreement[3] is essentially a contract between the Schmidts and other individuals on the one hand and Magnetic Head on the other, which provides for the purchase of all of the shares of MCP by Magnetic Head in exchange for 47.5% of Magnetic Head stock. It contains sections pertaining to the aggregate purchase price for the shares of MCP, representations and warranties of the parties, the conduct of business prior to closing, the survival of representations, warranties and covenants, and a "catch all" section of additional provisions. Included in the latter is subsection (h) which reads as follows: "(h) At the closing the sellers shall sign and deliver a Shareholders Agreement by and among themselves, the Buyer and James North, Royce McKinley and Charles S. Rockwell as Proxy Holders, in the form annexed hereto as Exhibit N, and each Seller shall have signed and delivered an Irrevocable Proxy in the form annexed to the Shareholders Agreement as an exhibit hereto."

We conclude that it cannot be inferred from a reading of the two agreements together that the Schmidts were to be afforded the right to select at least one third of the board of directors during the life of the shareholders' agreement. Rather, we believe that the *raison d'être* for the shareholders' agreement was to create and implement a proxy system of voting shares of Magnetic Head during the life of that agreement and to vest concomitant powers and duties in the proxy holders to accomplish that purpose.

Further, when the board of directors selected Gleason to fill the vacancy, the action was not interdicted by any language contained in the shareholders' agreement but, more important, was consistent with the authority vested in the remaining directors by statute (see Business Corporation Law, § 705; see, also, Business Corporation Law, § 602, subd [b]). In sum, we decline to fashion a new clause to be placed in the shareholders' agreement which the plaintiffs believe to be more equitable (cf. *Laba v Carey*, 29 NY2d 302, 308).

---

**3.** Although the acquisition agreement is not part of the record on appeal, we have taken judicial notice of it because it is contained in the record on appeal in another case now pending in this court (*Matter of Ordway*, 196 NY 95; *Rossbach v Rosenblum*, 260 App Div 206, affd 284 NY 745; Richardson, Evidence [Prince, 10th ed], § 30).

■ The determination sustaining the causes of action for reformation and rescission should also be upheld. True, as defendants correctly assert, absent fraud, unilateral mistake is not a ground for reformation (*Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 219; *Nash v Kornblum,* 12 NY2d 42, 46) and an instrument may not be reformed to include a provision that one party suggested and the other rejected (*Mason v Mason,* 41 AD2d 607). But such defenses revolve around disputed factual questions appropriately left for resolution at trial and do not warrant dismissal of the complaint as a matter of law (see *Hotel Credit Card Corp. v American Express Co.,* 13 AD2d 189, 193). Liberally read, as it must be at the pleading stage (CPLR 3026; *Guggenheimer v Ginzburg,* 43 NY2d 268, 275; *National Compactor & Technology Systems v Kohleriter & Spandorf,* 38 NY2d 933; *Foley v D'Agostino,* 21 AD2d 60, 64-65), the complaint alleges a mutual mistake of the parties (see 13 Williston, Contracts [3d ed], §§ 1548, 1549).

As for rescission, the complaint states that the ability to designate a successor was a material element of the agreement, and without such a provision, the parties failed to achieve a meeting of the minds. We similarly construe this cause of action as alleging mutual mistake which, if proven, would entitle plaintiffs to rescission (*Coffin v City of Brooklyn,* 116 NY 159; *Brauer v Central Trust Co.,* 77 AD2d 239, 243; *Sheridan Drive-In v State of New York,* 16 AD2d 400, 405).

We now turn to plaintiffs' appeal from the denial of the portion of their cross motion which sought to enjoin Magnetic Head primarily from indemnifying the defendant directors for the legal expenses they have incurred in defending this action. Defendants' position is straightforward: indemnification is proper pursuant to section 724 (subd [b], par [2], cl [A]) of the Business Corporation Law. That section provides that litigation expenses of directors may be paid by the corporation when authorized "[b]y the board upon the opinion in writing of independent legal counsel that indemnification is proper".

The payment to the directors was made on the basis of an opinion letter issued by William Downey on behalf of a law firm known as Lovejoy, Wasson & Ashton, P. C. The letter

states that the standard for indemnification, i.e., that the directors acted in "good faith, for a purpose which [they] reasonably believed * * * in * * * the best interests of the corporation" (Business Corporation Law, § 723, subd [a]), had been met.

■ Plaintiffs challenge the independence of Downey's firm. They observe that Downey was retained by a partner in the firm which represented the corporation and the defendant directors. Yet, Downey owned no stock in Magnetic Head, had not previously represented the corporation, and had no past relationship with any of the company's officers or directors. There is no evidence concerning any other member of the firm. Special Term concluded that "there was no showing of any lack of independence". Based upon the statutory provisions and their history, we agree.

At common law, no right of indemnification accrued to directors in an unsuccessful defense of an action brought against them by shareholders, though a possible exception existed where the corporation was substantially benefited (see, e.g., *Warnecke v Forty Wall St. Bldg.*, 16 Misc 2d 467, 468-469, affd *sub nom. Marine Midland Trust Co. v Forty Wall St. Corp.*, 13 AD2d 630; Comment, Indemnification of Management for Litigation Expenses, 52 Mich L Rev 1023).[4] On the other hand, when the defense proved successful, authorities divided on the question of whether a common-law right of indemnification existed (Henn & Alexander, Law of Corporations [3d ed], § 379, p 1117). New York followed the view that there was no such right (see, e.g., *New York Dock Co. v McCollum,* 173 Misc 106 [Crouch, Off Ref]).

In order to rectify the perceived inequity, New York took the lead in 1941 by enacting the first indemnification statute (L 1941, chs 209, 350; see 1945 Report of NY Law Rev Comm, NY Legis Doc, 1945, No. 65 [E], pp 131-175; 1957 Report of NY Law Rev Comm, NY Legis Doc, 1957, No. 65 [J], pp 315-345). Other States quickly joined (see, e.g., Cheek, Control of Corporate Indemnification: A Proposed Statute, 22 Vand L Rev 255; Sebring, Recent Legislative Changes in The Law of Indemnification of Directors,

---

4. Officers and employees, as distinguished from directors, might qualify as agents of the corporation and thus might obtain indemnification under agency principles (Restatement, Agency 2d, § 439 *et seq.; Cohn v Lionel Corp.,* 21 NY2d 559).

Officers and Others, 23 Bus Law 95). Several different approaches have been taken. Some statutory schemes simply grant the corporation a power to indemnify. Others make it a matter of right, while still others combine the two approaches (Henn & Alexander, *op. cit.*, § 380, p 1121). All were enacted "to induce capable and responsible businessmen to accept positions in corporate management" (*Merritt-Chapman & Scott Co. v Wolfson,* 264 A2d 358, 360 [Del]) by protecting them against personal risk (see 3A Fletcher's Cyclopedia Corporations [perm ed], § 1344; 13 Fletcher's Cyclopedia Corporations [perm ed], § 6045.1).

The present New York statutory provisions, which are exclusive (Business Corporation Law, § 721), provide that a director, acting "in good faith, for a purpose which he reasonably believed to be in * * * the best interests of the corporation" (Business Corporation Law, § 723, subd [a]), may be indemnified by the corporation he serves for judgments, settlement payments and litigation expenses. Indemnification is a matter of right if the director is wholly successful (Business Corporation Law, § 724, subd [a]). If the director is not wholly successful or if indemnification is sought during the pendency of the action, indemnification may be made by the corporation if the "good faith" standard of section 723 is met. The finding of "good faith" may be made by a quorum of the board who are not parties to the action, by the shareholders, or "[b]y the board upon the opinion in writing of independent legal counsel" (Business Corporation Law, § 724, subd [b], par [2], cl [A]; subd [c]).

The term "independent legal counsel" is not statutorily defined and we have found no New York case construing it (see 3 White, New York Corporations [13th ed], par 724.02). Nonetheless, we are not without guideposts. The Model Business Corporation Act (1980, § 5, subd [e]) contains an analogous provision requiring the determination to be made by "special legal counsel". Many of the members of the advisory committee believed that such counsel should have "no prior professional relationship with the corporation or those seeking indemnification * * * and should not be either inside counsel or regular outside counsel" (Changes in the Model Business Corporation Act Affecting Indemnification of Corporate Personnel, Report

of the Committee on Corporate Laws, 36 Bus Law 99, 114). Eschewed was a proposal to disqualify an attorney simply because he previously performed services for a person to be indemnified.

We note that commentators, as well, emphasize that "independent" counsel should not have an on-going relationship with the corporation (see Bishop, Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers, 77 Yale LJ 1078; Symposium, Officers' and Directors' Responsibilities and Liabilities, 27 Bus Law [Feb., 1972] 109-164; McAdams, A Proposal to Amend the Indemnification Section [§ 5] of the Model Business Corporation Act, 31 Bus Law [No. 4] 2123) and that "[s]ome attorneys or retired judges might well specialize in this kind of practice" (Henn & Alexander, *op cit.,* § 380, p 1127, n 21).

In the end, the concern is basically to guard against counsel passing judgment upon his own acts (cf. *Securities & Exch. Comm. v North Amer. Fin. Co.,* 214 F Supp 197, 200 [independent certified public accountant]). We thus hold that "independent legal counsel" under section 724 of the Business Corporation Law is an attorney who is free from past connections with the corporation or the persons to be indemnified. We decline any invitation to establish a system by which the judiciary will select independent counsel, supervise the selection process (see Hoffman, The Status of Shareholders and Directors under New York's Business Corporation Law: A Comparative View, 11 Buf L Rev 496, 581; cf. *Matter of Siegel [Lewis],* 40 NY2d 687) or otherwise correct purported defects in the legislation.

Under the standard we have enunciated the independent counsel requirement has been met. Neither Downey nor, from what we are able to discern from the record, any member of the firm had a present or past relationship with Magnetic Head or its directors. While we are aware that one lawyer retained by another may well feel a sense of responsibility for his retainer, we are content to rely upon counsel's fiduciary obligation to the corporation and the strictures set forth in the Code of Professional Responsibility (EC 5-21, 5-22; DR 5-107).

We must also reject plaintiffs' claim that Downey's investigation was a sham as a matter of law because he did not interview the parties to the litigation. Downey testified at the hearing on the cross motion to enjoin indemnification payments that he had examined the pleadings and certain affidavits and exhibits but had not interviewed plaintiffs, their counsel or the defendant directors. Aside from the complaint, which does not directly impugn Downey's good faith, these documents are not contained in the record on appeal. Since the motives of the directors and their loyalty to the corporation are the focus of the "good faith" standard (3 White, New York Corporations [13th ed], par 723.01), we believe it best to leave the ultimate determination as to whether the defendant directors should have been indemnified to the trier of fact (Business Corporation Law, § 726, subd [a]).

■ The final question is whether Farrell, Fritz, Caemmerer & Cleary, P. C., should be disqualified from representing both Magnetic Head and the defendant directors. We conclude that denial of this aspect of the cross motion was also proper.

Unlike a derivative suit, where an adverse interest generally exists between a corporation and its directors (see, e.g., Patton, Disqualification of Corporate Counsel in Derivative Actions: Jacuzzi and the Inadequacy of Dual Representation, 31 Hast LJ 347; Note, Independent Representation for Corporate Defendants in Derivative Suits, 74 Yale LJ 524), Magnetic Head's current posture is that of a passive litigant in an action involving the rights of competing stockholder factions to select a corporate director (cf. *Garlen v Green Mansions,* 9 AD2d 760). There is no allegation that Magnetic Head will benefit or suffer from the outcome of this lawsuit and matters of corporate policy are not in issue.

We recognize that disqualification motions are often used for tactical purposes (see, e.g., *Matter of Schumer v Holtzman,* 60 NY2d 46, 55; *Allegaert v Perot,* 565 F2d 246, 251) and, in the absence of a demonstrated conflict of interest (compare *Evans v Artek Systems Corp.,* 715 F2d 788, and *Greene v Greene,* 47 NY2d 447, with *Martin v Donghia Assoc.,* 73 AD2d 898; see Code of Professional

Responsibility, DR 5-105), a party's selection of counsel should not lightly be interfered with (*Board of Educ. v Nyquist,* 590 F2d 1241, 1246; *Grant Co. v Haines,* 531 F2d 671, 677; cf. *People v Gomberg,* 38 NY2d 307, 312).

For the reasons stated, the orders appealed from should be affirmed.

LAZER, J. (concurring). A primary issue on these appeals involves the interpretation and construction of a share-holders' agreement that required plaintiffs to transfer their voting rights to three proxy holders who were in turn required to vote the shares for three named directors. The resignation of one of the named directors has precipitated a dispute over who possesses the power to name a replacement director. Despite plaintiffs' assertion that it is they who have the power since the named directors were there to protect the plaintiffs' interests, I agree with my colleagues of the majority that the agreement does not imply the power the plaintiffs seek. Since my rationale differs from that of the majority, I write separately on the replacement issue but I agree with the disposition of the other issues on these appeals.

Although the plaintiffs argue that the shareholders' agreement is ambiguous, I do not believe it is susceptible to multiple meanings. What is missing from that agreement is a provision that would have safeguarded the plaintiffs' interests in the event one of the named directors departed. I do not regard the omission in the agreement as an ambiguity and I cannot agree with Justice GIBBONS that extrinsic evidence may be received to determine whether an ambiguity exists. In this State it is not permissible to introduce extrinsic evidence to show that an ambiguity exists; such a conclusion must derive from the face of the agreement itself (see *Sutton v East Riv. Sav. Bank,* 55 NY2d 550; *Breed v Insurance Co. of North Amer.,* 46 NY2d 351; *Fiore v Fiore,* 46 NY2d 971).

I also disagree with Justice GIBBONS' conclusion that the plaintiffs' authority to select a replacement director may be implied from the agreement. A term may be implied only where it may be assumed that it would have been included if attention had been drawn to it (*Long Is. R. R. Co. v Northville Inds. Corp.,* 41 NY2d 455, 461) and where

it is reasonably inferable from the language of the contract (*Sutton v East Riv. Sav. Bank, supra,* p 555). Embraced in the interpretive result should be " 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' " (*Rowe v Great Atlantic & Pacific Tea Co.,* 46 NY2d 62, 69). In other words, an implied promise is one that is made by the promisor but was not put into contractual language with sufficient clarity to be called an express promise (see *Wood v Duff-Gordon,* 222 NY 88; 3 Corbin, Contracts, § 562). By finding a basis for implication, Justice GIBBONS is declaring that it is plain from the face of the agreement that the missing replacement power is really not missing but has actually been imperfectly expressed somewhere in the agreement. While the replacement power was a safeguard the plaintiffs obviously should have sought, what the agreement reflects is that plaintiffs obtained only partial protection. There is no indication in either the acquisition agreement or the shareholders' agreement that full protection was intended.

My difficulty with the majority position is that it seems to propound the proposition that the purpose of the shareholders' agreement was not to provide protection for the plaintiffs at all but simply to create a proxy system for the convenience of the parties. The majority thus attributes to the instant proxy system an independent purpose apart from the imposition of restrictions on the voting rights of an otherwise controlling block of stock, a commonplace use for such a mechanism (see 3 White, New York Corporations [13th ed], par 620.02). I find it difficult to accept such a narrow view of the purpose of the agreement. Its purpose was not merely to create a proxy system but to restrict the plaintiffs' substantial voting rights while also providing them with a voice in the control of the company. As the agreement currently reads, the proxy holders must vote in favor of the three named persons for directors but in the absence of a provision requiring the proxy holders to vote for any particular replacement for these directors they are free to vote as they see fit when a vacancy occurs. Therefore, upon the resignation of North the board of directors may fill the vacancy until the next shareholders' meeting

(see Business Corporation Law, § 705; *Matter of Caplan v Lionel Corp.*, 20 AD2d 301, affd 14 NY2d 679) and when that time arrives the shareholders can pick whomever they desire, subject, of course, to the proviso that the proxy holders must vote for the two plaintiffs.

Although the plaintiffs have not relied on section 204 of the Restatement, Contracts, Second, I have considered that section in connection with these appeals. Section 204 provides that when the parties to a contract "have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court". While the section can be utilized to save contracts that might otherwise be void for indefiniteness (see Speidel, Restatement Second: Omitted Terms and Contract Method, 67 Cornell L Rev 785, 803), I conclude that it has no application to this case. Use of section 204 as an instrument to repair the consequences of unilateral mistake under circumstances such as those here might undermine established principles of the law of reformation. Those principles require that before an instrument is reformed on the ground of mutual mistake it must be demonstrated that the mistake was mutual (see *Backer Mgt. Corp. v Acme Quilting Co.*, 46 NY2d 211). Plaintiffs' remedy is to establish mutual mistake.

GIBBONS, J. (concurring in part and dissenting in part). I agree with so much of the opinions of my colleagues as hold that plaintiffs' causes of action for reformation, rescission and return of indemnification moneys will withstand a motion to dismiss. I also agree that plaintiffs' cross motions to disqualify defendants' attorneys and to preliminarily enjoin defendant Magnetic Head Corporation (Magnetic Head) from indemnifying the individual defendants were properly denied. I submit, however, that plaintiffs' three causes of action for specific performance, construction and breach of contract, all turning on how the shareholders' agreement is to be interpreted, should not be dismissed.

Before examining the relevant provisions of the shareholders' agreement, a brief review of basic principles is warranted. To interpret a contract "is to ascertain the substantial intent of the parties" (*O'Neil Supply Co. v Petroleum Heat & Power Co.*, 280 NY 50, 55). Absent

allegations of fraud or mistake or other circumstances which would allow for reformation or rescission (see *Hutchison v Ross,* 262 NY 381, 398), the relevant intent to be found is not the subjective or real intent of the parties to the agreement, but rather the intent expressed or implied in what they wrote (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285, 291; *Raleigh Assoc. v Henry,* 302 NY 467, 473; see 4 Williston, Contracts [3d ed], §§ 600, 610). Of necessity, then, the focus is on the agreement itself, taking into account express terms and those " 'which a reasonable person in the position of the promisee would be justified in understanding were included' " (*Rowe v Great Atlantic & Pacific Tea Co.,* 46 NY2d 62, 69, quoting from 5 Williston, Contracts [rev ed, 1937], § 1293, the substance of which is now in 4 Williston, Contracts [3d ed], § 610B).

Over the years the courts have fashioned various rules of contract interpretation to aid in the task of ascertaining the meaning of an agreement (see, generally, 4 Williston, Contracts [3d ed], §§ 618-630). Several of the rules are pertinent here, including the principles that a writing will be read as a whole, with each part being interpreted with reference to the whole and with no part left meaningless or useless (see *Corhill Corp. v S. D. Plants, Inc.,* 9 NY2d 595); that the purpose of the parties must be considered so that the interpretation is consistent with that purpose (*Matter of Cromwell Towers Redevelopment Co. v City of Yonkers,* 41 NY2d 1, 6; *O'Neil Supply Co. v Petroleum Heat & Power Co.,* 280 NY 50, *supra*); that an interpretation which is fair and reasonable will be preferred over an interpretation which is harsh or unreasonable (*Chemung Canal Trust Co. v Montgomery Ward & Co.,* 4 AD2d 95, 102, affd 4 NY2d 1017); that separate instruments, executed at the same time and relating to the same subject matter, should be read together (*Matter of Herzog,* 301 NY 127); and that the circumstances under which the agreement was executed should be considered, if to do so would aid the court in putting itself in the position of the parties to better understand the meaning of the words used (*Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285, 292, *supra;* 4 Williston, Contracts [3d ed], § 618, pp 716-717, § 629).

Furthermore, the language of the contract should not necessarily be taken literally (*Spencer v Childs,* 1 NY2d 103, 106-107). Thus, for example, "[t]o carry out the intention of a contract, words [or grammar] may be transposed, rejected, or supplied, to make its meaning more clear" (*Castellano v State of New York,* 43 NY2d 909, 911; *Decker v Carr,* 11 App Div 432, affd 154 NY 764; see 4 Williston, Contracts [3d ed], § 619, pp 737-740).

Turning to the case at bar, the particular provision in the shareholders' agreement which is most at issue, and which is found in paragraph 3, states that "during any period in which Robert J. Schmidt, Jr., and Barbara B. Schmidt, and their associates * * * are the holders of 30% or more of the common shares of the Company the Proxy Holders shall vote the Shares for the election of Herbert J. Schmidt, Jr., Barbara B. Schmidt and James North for election as Directors and for determining the number of directors at not more than nine". I submit that, giving the plaintiffs and their complaint the benefit of every favorable inference, which we must do since we are considering a motion to dismiss (*Rovello v Orofino Realty Co.,* 40 NY2d 633), this particular provision of the contract may be found to mean that the Schmidts and their associates have the right to choose three members on Magnetic Head's board of directors during the life of the agreement provided that they continue to own 30% or more of the company's shares. Therefore, I conclude that dismissal of the three causes of action, which pertain directly to the proper interpretation to be placed on the agreement, is improper.

Keeping the already discussed general principles of contract law in mind, it is clear that the shareholders' agreement was executed within the context of the merger of MCP Corporation into Magnetic Head. The Schmidts' interest in MCP and the relative size and value of the two companies prior to the merger were apparently such that, were it not for the temporary relinquishment of voting rights established by the shareholders' agreement, the Schmidts would have gained control of the merged corporation, Magnetic Head. Thus, in effect, MCP would have taken over Magnetic Head, and not vice versa. To prevent this from happening, and to keep Mr. Rockwell and his

group from being placed in a vulnerable position within Magnetic Head, the shareholders' agreement was entered into, whereby the Schmidts relinquished their voting power in Magnetic Head to three proxy holders for as long as Mr. Rockwell was engaged in the management of the company. However, apparently the Schmidts did not totally capitulate, giving away all control. A *quid pro quo* was arranged, whereby a maximum term of 10 years was placed on the life of the shareholders' agreement, and whereby, while the agreement was in effect, the Schmidts retained some measure of control of the policy making apparatus of the corporation. This was achieved by allowing one of the three proxy holders to be a Schmidt designee, and through the provision which limits the size of the board of directors and which states that Mr. and Mrs. Schmidt, along with North, the Schmidts' attorney, would be on the board of directors. The purpose of the agreement was not, as maintained by my colleagues in the majority, simply to create a proxy system of voting. The proxy system is only the means to effect a greater purpose, which was to create and maintain a delicate balance of power within Magnetic Head for so long as Mr. Rockwell was managing the company, for up to 10 years.

The majority's interpretation of the agreement may well throw this balance askew. According to its view, since the agreement specifies that the proxy holders will vote for "Herbert J. Schmidt, Jr., Barbara B. Schmidt and James North" as directors, the proxy holders are not compelled to vote in any certain way if any of the positions occupied by Mr. Schmidt, his wife or North, become vacant. This means that if Mrs. Schmidt, for example, no longer wishes to bear any responsibilities on the board, perhaps because of sickness or other reason, she and her husband cannot designate her successor. In other words, if the Schmidts want to have any voice in the making of policy for Magnetic Head during the life of the agréement, they personally must retain their positions on the board. Not only do they lack control over the position previously occupied by North, but they lack control over their own positions. The theoretical possibility, of course, is that through retirement, sickness or what have you, the owners of the Schmidts' shares in

Magnetic Head may have no voice on the board of directors, despite owning almost 50% of the corporation. Such a result is hardly consistent with the purpose of maintaining the balance of power which the shareholders' agreement was designed to achieve.

All this is simply to say that taking into account the circumstances of the merger, the apparent position of the primary actors in the merger, the purpose of the shareholders' agreement, and reading the agreement as a whole, it might properly be concluded that the Schmidts have the authority to designate North's successor. The Schmidts' authority might be considered implied in fact, such that, while the agreement does not expressly set forth who should nominate North's replacement, a reasonable person would nevertheless conclude that the Schmidts possessed that power (cf. *Sutton v East Riv. Sav. Bank,* 55 NY2d 550, 555-556; *Morlee Sales Corp. v Manufacturers Trust Co.,* 9 NY2d 16, 20). Alternatively, it might be concluded that the provision in paragraph 3, which speaks about the Schmidts owning at least 30% of the shares and Mr. and Mrs. Schmidt and North being on the board, should not be taken literally. Rather, this provision may manifest an intent whereby, so long as the Schmidts or their successors own at least 30% of Magnetic Head, they can designate who should occupy three positions on a board of directors made up of no more than nine persons.

Up until now I have not considered the possibility of extrinsic evidence, and its effect on how the agreement should be interpreted. Plaintiffs' second cause of action, for construction, specifically alleges that the agreement is ambiguous. Much has been said in the parties' briefs on appeal concerning the question of ambiguity and the use to be made of extrinsic evidence to establish intent. The rule is well established, and is really but a corollary to the axiom that intent is to be gleaned from the instrument itself, that extrinsic evidence is inadmissible to vary, alter or contradict a contract which is complete, unambiguous, valid and unaffected by fraud, duress, mistake or illegality (see, generally, Richardson, Evidence [Prince, 10th ed], §§ 601-632). However, where a contract is not integrated or is only partially integrated, parol evidence which is not

contradictory to what has been written is admissible to complete the writing (*Fogelson v Rackfay Constr. Co.,* 300 NY 334; *Smith v Slocum,* 71 AD2d 1058). Similarly, parol evidence is, of course, admissible to clarify any ambiguity in what has been expressed (*67 Wall St. Co. v Franklin Nat. Bank,* 37 NY2d 245, 248-249).

I do not seek to quarrel with the majority's contention that an omission in a contract should not be considered an ambiguity allowing for extrinsic proof. I submit that an omission which cannot be filled by implication may not be remedied through extrinsic proof unless the agreement is not integrated or is only partially integrated (see *Fogelson v Rackfay Constr. Co.,* 300 NY 334, *supra;* Richardson, Evidence [Prince, 10th ed], § 614). In the case at bar, the agreement appears to be integrated. However, as already argued, in the present posture of this case it cannot be said that the agreement does not, impliedly or through a broad reading of paragraph 3, give the Schmidts the authority to replace North with someone of their choosing. Thus, we cannot say, on this motion to dismiss, that there is, in fact, an omission which cannot be filled by implication. Furthermore, I submit that the provision in paragraph 3, relating to the three directors, may be ambiguous, allowing for extrinsic evidence.

It is not the case that ambiguities in an agreement always reveal themselves on a reading confined to the agreement itself. Some ambiguities are latent, requiring extrinsic evidence not only to explain their meaning, but also to reveal their very existence (*Todem Homes v Freidus,* 84 Misc 2d 1023, 1029, mod on other grounds 55 AD2d 640; Ambiguity in Contract — Extrinsic Evidence, Ann., 40 ALR3d 1384, § 4; see Richardson, Evidence [Prince, 10th ed], § 629). On a motion for summary judgment, where ambiguity is alleged, it is incumbent on the party claiming ambiguity to set forth his proof so that the court can determine if a trial is necessary to pass on the credibility of the extrinsic evidence (*Sutton v East Riv. Sav. Bank,* 55 NY2d 550, *supra; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285, *supra*). However, this case is not presently before us in the context of a motion for summary judgment. Defendants moved to dismiss the com-

plaint pursuant to CPLR 3211. The sufficiency of the pleadings is at issue, not whether plaintiffs in fact have extrinsic proof which would suggest that the shareholders' agreement is ambiguous. If the court had converted the motion to one for summary judgment, providing adequate notice to the parties (CPLR 3211, subd [c]), then the plaintiffs would have been compelled to set forth what they intended to show at trial (*Rovello v Orofino Realty Co.,* 40 NY2d 633, 635, *supra*). Without such a conversion, plaintiffs may have been lulled into believing an extensive evidentiary showing was unnecessary. Since plaintiffs have not yet had an opportunity to present any extrinsic evidence they may have, it should not be presumed that there is no ambiguity in the relevant provisions found in the agreement (cf. *Rich v Lefkovits,* 56 NY2d 276, 281-282; *Rovello v Orofino Realty Co., supra,* p 636).

My conclusion is that the interpretation of the shareholders' agreement proffered by the plaintiffs is a rational one, which cannot be precluded as a matter of law on a motion to dismiss. Accordingly, I vote to reinstate plaintiffs' first, second and fifth causes of action.

DAMIANI, J. P., and MANGANO, J., concur with TITONE, J.; LAZER, J., concurs in the result, with an opinion; GIBBONS, J., concurs in part, and dissents in part, with an opinion.

Three orders of the Supreme Court, Nassau County, dated July 14, 1981, September 28, 1981 and October 2, 1981, respectively, affirmed insofar as appealed from, without costs or disbursements.