Board of Education of the Northport-East Northport Union Free School District AND BOARD OD EDUCATION OF THE PORT JEFFERSON UNION FREE SCHOOL DISTRICT, Plaintiffs,

against
Long Island Power Authority, LONG ISLAND LIGHTING COMPANY d//b/a LIPA, NATIONAL GRID US8, Inc. a/k/a NATIONAL GRID USA, INC., NATIONAL GRID GENERATION, L.L.C., NATIONAL GRID, P.L.C., KEYSPAN CORPORATION, KEYSPAN GENERATION, L.L.C., KEYSPAN ELECTRIC SERVICES, L.L.C., KEYSPAN ENERGY TRADING SERVICES, L.L.C. and BROOKLYN UNION GAS, Defendants.


15194-11

INGERMAN SMITH, L.L.P.
Attorneys for Plaintiffs
150 Motor Parkway, Suite 400
Hauppauge, New York 11788
RIVKIN RADLER LLP
Attorneys for Defendants Long Island Power Authority and Long Island Lighting Company d/b/a LIPA
926 RXR Plaza
Uniondale, New York 11556
CULLEN AND DYKMAN LLP
Attorneys for Defendant National Grid Generation, L.L.C. 100 Quentin Roosevelt Boulevard
Garden City, New York 11530


Elizabeth H. Emerson, J.

Upon the following papers numbered1-201read on this motion and cross motion for summary judgment ; Notice of Motion and supporting papers1-83 ; Notice of Cross Motion and supporting papers 84-171 ; Answering Affidavits and supporting papers172-190 ; Replying Affidavits and supporting papers191-193 ; Other 194-199; 200-203 ; and after hearing oral argument in support of and in opposition to the motion and cross motion; it is,
ORDERED that the motion by the defendants Long Island Power Authority, Long Island Lighting Company, and National Grid Generation L.L.C. for summary judgment is granted; and it is further
ORDERED that the cross motion by the plaintiffs for summary judgment is denied; and it is further 
ORDERED that the second, fourth, fifth, sixth, seventh, and eighth causes of action for breach of contract, promissory estoppel, and injunctive relief are dismissed; and it is further
ORDERED that the first and third causes of action for declaratory relief are resolved with a declaration that the defendants Long Island Power Authority, Long Island Lighting Company, and National Grid Generation L.L.C. may challenge the real-property tax assessments on the power-plant properties situated in the Northport-East Northport and Port Jefferson School Districts. 
FACTS
This case has its genesis in the Long Island Power Authority's takeover of the Long Island Lighting Company ("LILCO"), formerly the investor-owned provider of electric power and energy on Long Island. In 1986, New York State enacted the Long Island Power Authority Act (Public Authorities Law, art 5, tit 1-A), which created the Long Island Power Authority ("LIPA"), a not-for-profit public authority with broad powers to effectuate the legislation's purposes. Those purposes were primarily to close the Shoreham nuclear power plant, to replace LILCO as the provider of electric and gas power on Long Island, and to reduce power costs for Long Island ratepayers (Matter of Citizens for an Orderly Energy Policy v Cuomo, 78 NY2d 398, 407). As a public authority, LIPA could acquire LILCO's taxable debt and equity and [*2]refinance the debt with lower cost, tax-exempt debt. Moreover, LIPA was not obligated to pay federal income taxes. It was, therefore, thought that LIPA could achieve significant cost savings for Long Island's ratepayers.
On February 28, 1996, LIPA's Board of Trustees passed a resolution authorizing LIPA's Chairman [FN1]
and his designees to enter into negotiations for the acquisition of LILCO. The negotiations were predicated on a transaction structure in which certain assets of LILCO, including its gas, generating, and common plant assets, would be distributed to a new company owned by the shareholders of LILCO and the Brooklyn Union Gas Company ("BUG") immediately prior to a cash merger of LILCO with an acquisition subsidiary to be formed by LIPA. As a result, LILCO would become a wholly owned subsidiary of LIPA. The principal issues during the negotiations were the identification of the cash assets to be distributed by LILCO; the price to be paid by LIPA; the treatment of LILCO's preferred stock and debt; the terms and conditions of the service agreements to be entered into by LILCO with the new company; and the rights LIPA would have to acquire LILCO's generating facilities and to develop certain real-estate parcels for future generating, transmission, and distribution facilities. 
The negotiations culminated in a non-binding Agreement in Principle dated March 19, 1997, among LIPA, LILCO, and BUG. Pursuant to the terms of the Agreement in Principle, LIPA would acquire LILCO's common and preferred stock for $2.5 billion and $4 million, respectively; assume $3.7 billion of LILCO's pre-existing debt; and become the owner of LILCO's electric transmission and distribution facilities; among other things. LILCO would continue to own the power plants and the land on which they were situated.[FN2]
The Agreement in Principle required the future execution of three separate agreements, including the Power Supply Agreement (or "PSA"), which is the subject of this action. Pursuant to a resolution dated March 21, 1997, LIPA's Board of Trustees approved and ratified execution of the Agreement in Principle and authorized LIPA's Chairman and his designees "to negotiate the terms of the definitive acquisition agreement, management services agreement and power supply agreement, and all other agreements necessary or appropriate to implement the Agreement in Principle[.]" Extensive negotiations for the drafting of those agreements ensued. 
One of the issues that arose during the negotiations was the amount of the property taxes that LILCO paid on its power-generating facilities, including the Northport and Port Jefferson power plants. By March 1997, LILCO had obtained two judgments for $81 million and $868 million, respectively, against the Town of Brookhaven in tax-certiorari proceedings challenging the property-tax assessments on the Shoreham nuclear power plant (Town of Islip v Long Is. Power Auth., 301 AD2d 1, 4). Moreover, LILCO had commenced numerous other tax-certiorari proceedings challenging the assessments on its power-generating facilities that were still pending at the time. Consequently, the towns and school districts where LILCO's power plants were [*3]located were very concerned about their tax revenues. They sought assurances that the takeover plan would not hurt them financially, that tax revenues would not decrease after the takeover, that the pending tax-certiorari proceedings would not be continued, and that LILCO would not be able to institute any new tax-certiorari proceedings. 
Richard Kessel took over as LIPA's Chairman in April 1997. At the time, he publicly stated that he wanted to maintain the tax revenues that LILCO paid to the towns and school districts where its power-generating facilities were located. To build political support for the takeover, he had numerous conversations about maintaining tax revenues with the Nassau County Executive; the Supervisors of the Towns of Huntington, Brookhaven, Hempstead, and North Hempstead; and State Senator Kenneth LaValle; among others. Moreover, in letters to the Nassau-Suffolk School Boards Association ("NSSBA") and State Senator LaValle, he assured them that the pending tax-certiorari cases would be discontinued and no new ones commenced.
On April 15, 1997, the NSSBA sent a letter to Kessel seeking, inter alia, guarantees that LIPA would not pursue the tax-certiorari cases that were pending at the time and that LIPA would not institute any tax-certiorari cases in the future. By a letter dated May 2, 1997, Kessel responded, in pertinent part, as follows:
"Let me also guarantee you that LIPA will immediately drop all tax certiorari cases against all municipalities and school districts on all of its properties immediately following the takeover. Furthermore, LILCO will drop all of its remaining tax suits at the same time and neither LIPA nor LILCO will initiate any further tax certiorari cases on any of their respective properties at any time in the future unless a municipality abusively increases its assessment rate. Traditional increases in local taxes and assessments along with any capital improvements will not represent a change in this promise. By the way, this language is specifically spelled out in the definitive agreements between LIPA/LILCO and Brooklyn Union."
In a conversation with Lorraine Deller, Chairperson of the NSSBA, Kessel reiterated that LIPA would "work with the school boards and all of the school districts to make sure that all of the litigation, tax challenges, would be dropped and that [LIPA] would make PILOT payments equal to what was being paid in taxes by LILCO [FN3]
and that [LIPA] wouldn't challenge any assessments going forward unless they were abusive."
On May 7, 1997, LIPA held a public meeting at the Norwood Avenue Elementary School in Northport to encourage support for the takeover plan. The meeting was attended by Kessel, then-Governor Pataki, the Huntington Town Supervisor, and the Superintendent of the Northport-East Northport School District, among others. It was also covered by the press. At the meeting, Governor Pataki stated, "[W]e are going to guarantee you and the other school districts that the assessments on these plants remain as they are, that the certioraris will be pulled and moved, and we are going to move forward in the best interest of all of Long Island." He also promised that no future tax-certiorari proceedings involving the Northport power plant would be initiated.
Despite these assurances, the school districts remained concerned about the tax-certiorari issue. The Superintendent of the Northport-East Northport School District expressed his concerns following the May 7, 1997, meeting in a memorandum to Allan Hyman, the School District's Special Counsel.[FN4]
After reviewing the PSA and the LIPA Agreement and Plan of Merger, Hyman responded by a letter dated May 20, 1997, in which he stated, inter alia:
"No one knows at this time whether the LIPA deal will result in the withdrawal of the pending tax certiorari proceedings.
* * *
"After closing, LILCO will continue to own the power generating facilities. The agreement does not preclude LILCO from contesting future assessments on power plant property after the deal closes.
* * *
"There is nothing in the agreement that will preclude LILCO from filing new tax certiorari proceedings after the LIPA deal is finalized.
* * *
"Based upon my review of the Agreement, there does not seem to be any significant protection for the school district's tax base. The only protection consists of a temporary standstill agreement with respect to tax certiorari proceedings prior to closing. The agreement is silent on whether LILCO may commence new tax certiorari proceedings . . . ." The Superintendent of the Northport-East Northport School District sent copies of the foregoing letter to Seth Hulkower, LIPA's Executive Director; State Senator Carl Marcellino; Assemblyman John Flanagan; State Senator James Lack; the Superintendents of the Port Jefferson, North Shore, and Island Park School Districts; and the Huntington Town Supervisor. He sought their assistance to ensure "that the language in the Agreement [is] rewritten so it matches the promises being made." 
In a memorandum dated May 23, 1997, to school board presidents, board members, and school superintendents, Lorraine Deller of the NSSBA expressed concern that the assurances given by some politicians would only apply to existing tax-certiorari cases and not to future claims. She stated,
"[S]chool districts which have a generating station, such as Northport or Port Jefferson should expect a large decrease in tax receipts. In spite of comments that this could not change, the property remaining with the new LILCO including the generating stations will experience challenges to the existing tax assessment. In fact, LIPA has included an incentive for the new LILCO to seek 'appropriate assessment of property taxes' relating to the generating facilities." The Superintendent of the Northport-East Northport School District sent a copy of Deller's memorandum to LIPA's Executive Director, Seth Hulkower. The Superintendent [*4]indicated that the looked forward to "seeing wording changes that . . . address directly the concerns of our school district and many others."
On June 9, 1997, State Senator LaValle forwarded a letter to Kessel from the Superintendent of the Port Jefferson School District expressing the School District's concern that the proposed LIPA takeover agreement did not adequately reflect Kessel's assurances that LILCO would immediately drop all pending tax-certiorari cases and not initiate any such cases in the future. In a letter to Senator LaValle dated June 19, 1997, Kessel responded as follows:
"Let me assure you all tax certiorari agreements - including the one in Port Jefferson - will be transferred to LIPA and immediately withdrawn. Furthermore, neither LILCO nor LIPA can file new certiorari cases unless the tax assessments on the plant are increased differently than other properties within the town. Obviously, an increase in taxes for everyone else in the district or capital improvements on the plant would not allow for the refiling of a tax certiorari case."
By a memorandum to the LIPA Board of Trustees dated June 16, 1997, Kessel sought approval of and authorization to execute the agreements that implemented the Agreement in Principle (the "Definitive Agreements"), including the Power Supply Agreement. Kessel advised the Board, inter alia, "The Definitive Agreements . . . provide that LIPA will acquire LILCO's Shoreham property tax and PILOT claims . . . . The Definitive Agreements also provide that LIPA will assume all of LILCO's other tax claims and tax certiorari matters arising with respect to LILCO's pre-closing operations. LIPA has indicated that it will abandon all such claims." Kessel said nothing about future tax claims. 
By a resolution of the same date, LIPA's Board of Trustees approved the Definitive Agreements and authorized the Chairman to execute them. The resolution also ratified "all acts and deeds previously performed by the Chairman, trustees or representatives of LIPA prior to the date of these resolutions that are within the authority conferred hereby[.]" A press release issued the same day announced that, in addition to rate cuts, "the LIPA plan resolves the $1.2 billion Shoreham tax certiorari case at $625 million, and prevents LILCO from initiating any other tax certiorari claims."LIPA and LILCO executed the Definitive Agreements on or about June 26, 1997. Under the terms of the PSA, LILCO agreed to sell and deliver to LIPA all of the capacity from its generating facilities and generating-facility sites,[FN5]
including the Northport and Port Jefferson power plants, and all of the energy produced from those facilities and other generating facilities located on Long Island for 15 years.[FN6]
At the end of the 15-year term, § 12.1 [*5]of the PSA provided, "LIPA may renew this Agreement for all capacity upon which it has not exercised its Ramp Down Option, under substantially the same terms and conditions as set forth herein, including but not limited to the continuation of a Ramp Down Option."[FN7]

In Article 8 of the Power Supply Agreement, LIPA agreed to make monthly payments to LILCO for the electricity delivered pursuant to the PSA (§ 8.1). One of the monthly payments that LIPA was required to make was the Monthly Capacity Charge, which compensated LILCO for the fixed costs of generating electricity, including income taxes, property taxes, and all other taxes (§ 8.1.1). LILCO continued to own the generating facilities and generating-facility sites and, as the owner, was the entity that was ultimately responsible for the property taxes thereon. The Monthly Capacity Charge transferred the burden of paying the taxes from LILCO to LIPA.[FN8]

§ 21.16 of the Power Supply Agreement allowed LILCO, or GENCO, to challenge the property taxes on the generating facilities and generating-facility sites in its sole discretion under certain limited circumstances. §21.16 provided, in pertinent part, as follows: 
"After the Contract Date, GENCO,[FN9]in its sole discretion, may challenge any property tax assessment on its Generating Facilities or Generating Facility Sites only if the assessment on any such challenged facilities is increased not in an appropriate proportion to the increase in value related to taxable capital additions affixed to the tax parcel between the last two tax status dates. If the tax attributable to the assessment on the Generating Facilities or Generating Facilities Sites is not included in the costs paid by LIPA or its Affiliates (e.g., gas facility located on Generating Facility site) then GENCO, in its sole discretion, may pursue tax challenges on such assessments. This provision shall expire upon the termination of this Agreement."
On July 1, 1997, LIPA held a public meeting at the Eastern Suffolk Board of Cooperative Educational Services ("BOCES") to address questions raised by the NSSBA regarding LIPA's [*6]takeover of LILCO. The meeting was attended by 37 school districts, as well as officers and members of the NSSBA. At the meeting, Kessel stated that tax revenues in the towns and school districts affected by the takeover would remain the same and never be reduced unless the assessed valuations of the power plants were "unfairly increased." He also stated that all pending tax-certiorari proceedings would be withdrawn and "never be restarted now or at any point in the future." Kessel gave the same assurances to the Superintendent of the Northport-East Northport School District in a telephone conversation in July 1997. 
Despite these assurances, the affected towns and school districts remained concerned that the language of § 21.16 did not accurately reflect the promises that had been made to them. On July 21, 1997, the Huntington Town Supervisor wrote to Kessel seeking confirmation that his understanding of the provisions of the LIPA-LILCO agreement relating to the assessment of the LILCO power plant located in Northport was correct. Kessel responded in a letter dated August 6, 1997:
"Your understanding of the LIPA/LILCO agreement and our commitments resulting from the agreement is accurate. Once the transaction closes, all pending certiorari proceedings against the Town of Huntington will be withdrawn. In the future, there will be no appeal or litigation of any assesment on the Northport facility unless Huntington Town singles out LIPA, LILCO, or Brooklyn Union Gas property for reassessment, thus increasing the assessment separate and apart from other properties located within the town.
"Furthermore, the agreement provides that routine increases in assessment for all properties and increases in assessment on various utility facilities, including Northport, as a result of capital improvements would not warrant certiorari challenges. Finally, it is important to note that this policy will apply to all facilities owned and/or operated by LIPA, LILCO, or Brooklyn Union Gas within the Town of Huntington [emphasis added]."
On September 30, 1997, Stanley Klimberg, LIPA's General Counsel, responded to a letter from Allan Hyman, Special Counsel to the Northport-East Northport School District, in which Hyman proposed changes to the Definitive Agreements, including § 21.16 of the PSA. The proposed changes would have added language that all pending tax-certiorari cases would be discontinued, with prejudice, and would have completely revised the language of § 21.16 with respect to future tax-certiorari cases. Klimberg declined to make the proposed changes, explaining that, because the LIPA-LILCO agreement had been entered into and ratified after months of negotiations, it was not possible to amend it. He did, however, acknowledge the promise by Kessel and the LIPA Board to withdraw all of the pending tax-certiorari cases, stating, "This is a promise that LIPA will keep." He did not say anything about future tax certioraris, but enclosed a copy of the foregoing letter from Kessel. 
Several years later, in 2004, LIPA withdrew all of the tax-certiorari proceedings that were pending at the time of LIPA's acquisition of LILCO. Then, in 2007, LIPA and LILCO entered into an agreement with KeySpan Corporation and National Grid USA, among others, in connection with the merger of KeySpan and National Grid (the "Agreement and Waiver").[FN10]
§ [*7]11 of the Agreement and Waiver provided as follows:
"Notwithstanding any provisions to the contrary in the PSA or the June 26, 1997 Agreement and Plan of Merger, between the KeySpan parties and LIPA, for the term of the PSA National Grid and Genco hereby agree that unless directed to do so by LIPA, they shall not initiate any tax certiorari proceedings with respect to any Genco "Generating Facilities", as such term is defined in the PSA."
At a committee meeting of the Suffolk County Legislature on May 9, 2007, Kessel testified about the Keyspan-National Grid merger and its impact on tax-certiorari matters. He stated, in pertinent part:
"And one final point for ratepayers that I think is important to you is under this agreement, National Grid will not be able to challenge on the tax certiorari end without our approval. And, you know, since we did the LIPA deal, we made — we made a commitment to Suffolk County and Nassau County that, you know, we would not allow any tax cert challenges on your plant — I don't mean plants — but on our plant unless it was so outrageous that it was something that LIPA was singled out. And we've never — we've never challenged any tax cert as far as I know. And that would be continued under this deal."
Kessel subsequently attended a meeting at the administrative offices of the Port Jefferson School District at which the Port Jefferson power plant was discussed. In a letter to State Senator Kenneth LaValle dated June 4, 2007, Kessel summarized the topics that were discussed and the statements that he made at the meeting. They included, inter alia, the following:
"At the meeting we discussed the ability of the community to rely upon the likelihood of receiving tax payments related to the Port Jefferson units into the future and especially in light of the proposed acquisition of KeySpan by National Grid. Let me reiterate what I said at the meeting — the obligation of the power plant owner to pay taxes doesn't change with the change of ownership of the power plants. Under the terms of the Power Supply Agreement (PSA), the owner of the generating plants is not allowed to initiate a tax certiorari case unless the taxes on the plant are raised disproportionately to other tax parcels. Further, in accordance with the agreement reached between LIPA and National Grid, National Grid agreed that it shall not initiate any tax certiorari proceedings with respect to the generating facilities for the term of the PSA, unless otherwise directed by LIPA. Therefore, as long as the tax assessment rates on utility property remain in proportion to assessment rates on other properties in Port Jefferson, there will be no tax certiorari cases brought by KeySpan or National Grid for the duration of the contract."
Kessel left LIPA in 2007. During his tenure and for three years thereafter, no one challenged the property taxes paid on any of GENCO's generating facilities. Then, beginning in 2010 and every year thereafter, LIPA and National Grid commenced separate tax-certiorari proceedings challenging the property-tax assessments on GENCO power plants located, inter alia, in Northport and Port Jefferson.[FN11]
In a letter to Michael Hervey, LIPA's Chief Operating [*8]Officer, dated November 9, 2010, the Huntington Town Supervisor and members of the Town Counsel stated that it was their understanding, "[S]ince the prior Tax Certiorari proceedings were settled in 2004 . . . LIPA [will] not bring a Tax Certiorari action at least until its agreement with National Grid with regard to the payment of real property taxes expires in 2013." Likewise, the Mayor of Port Jefferson stated in a letter to the Port Jefferson School District on or about August 23, 2010, "At the moment, LIPA has an agreement with National Grid to hold off on processing tax appeals until 2013." The PSA expired by its terms on May 28, 2013.
Several months before the PSA expired, on or about October 10, 2012, LIPA and National Grid entered into the Amended and Restated Power Supply Agreement (the "Amended PSA"). The Amended PSA took effect after the PSA expired and ran for another 15 years. It eliminated the restrictions on commencing tax challenges contained in § 21.16 of the original PSA and allowed GENCO to initiate such challenges "where appropriate." § 12.2 of the Amended PSA provided, in pertinent part, as follows:
"Genco shall, where appropriate, file challenges to the property tax assessments for each Generating Facility as of the commencement of the Term of this Agreement and shall prosecute such challenges diligently and in good faith. Genco shall consult with LIPA prior to entering into any settlement of a property tax challenge which may reasonably be expected to affect LIPA property tax payment obligations hereunder."
The Amended PSA also added a provision (§ 24.10) that neither party shall have any obligation to any third party as a result of the agreement (i.e., no-third-party beneficiaries). 

PROCEDURAL HISTORY
The plaintiffs commenced this action to recover damages for breach of contract and negligent misrepresentation and for declaratory and injunctive relief. The gravamen of the complaint was that the defendants were precluded from commencing tax-certiorari proceedings because the condition contained in § 21.16 of the PSA had not been met, i.e., taxes had not been disproportionately increased. The defendants moved to dismiss the complaint, inter alia, on the grounds that the plaintiffs had no legal capacity or standing to maintain this action and that they were not intended third-party beneficiaries of the PSA. By an order of this court dated May 21, 2013, the defendants' motion to dismiss was granted in part and denied in part (Board of Educ. of the Northport-E. Northport Union Free Sch. Dist. v Long Is. Power Auth., 39 Misc 3d 1232[A], 2013 NY Slip Op 50860[U]). That order was affirmed insofar as appealed from by an order of the Appellate Division, Second Department, dated July 29, 2015 (130 AD3d 953). 
The plaintiffs' second amended complaint contains eight causes of action to recover damages for breach of contract and promissory estoppel and for declaratory and injunctive relief. The plaintiffs allege that they are third-party beneficiaries of the PSA, that the defendants breached the PSA by commencing tax-certiorari proceedings in violation of § 21.16, and that the [*9]defendants breached the PSA by failing to renew it on substantially the same terms and conditions in violation of § 12.1. The plaintiffs also allege that the defendants are estopped from commencing and proceeding with tax-certiorari proceedings because the plaintiffs have relied to their detriment on the promises made by Kessel and others in letters, statements, and press releases (the "Extra-Contractual Promises").[FN12]
After issue was joined, the parties engaged in extensive discovery, which is now complete. LIPA, LILCO, and National Grid Generation L.L.C. (hereinafter "the defendants") move for summary judgment,[FN13]
and the plaintiffs cross move for the same relief. 
THE PARTIES' CONTENTIONS
The defendants contend, inter alia, that they have established as a matter of law that they did not breach § 21.16 of the PSA, that the plaintiffs are not intended third-party beneficiaries of § 21.16 of the PSA, that the Extra-Contractual Promises did not contractually bind LIPA, that it was unreasonable for the plaintiffs to rely on the Extra-Contractual Promises, that the Amended PSA contains no prohibition against the commencement of tax-certiorari proceedings on GENCO power plants after 2013, and that the Amended PSA expressly states there are no third-party beneficiaries thereto. 
The plaintiffs contend, inter alia, that they have established as a matter of law that they are intended third-party beneficiaries of § 21.16 of the PSA, that the defendants breached the PSA by commencing tax-certiorari proceedings in violation of § 21.16, that Kessel had both actual and apparent authority to bind LIPA, that they reasonably relied on the Extra-Contractual Promises to their detriment, that the defendants were required to extend the PSA on substantially the same terms, that those terms included the language of § 21.16, and that the Amended PSA could not discharge or modify their third-party-beneficiary rights because those rights had already vested. 
Neither side contends that there are facts in dispute that require a trial. While the parties interpret the facts differently, they agree that this case can and should be decided as a matter of law. It is, therefore, ripe for summary judgment. 
ANALYSIS
The Power Supply Agreement
In the many months that this matter has been pending before the court, the parties have debated the events and circumstances surrounding LIPA's takeover of LILCO. Both sides now focus on the language of § 21.16 of the PSA. They both contend that it is clear and [*10]unambiguous, although each side suggests a different "plain meaning" of that section. The plaintiffs contend that the plain language of § 21.16 evinces that it was included in the PSA solely for their benefit and for the benefit of other school districts and municipalities to protect their tax base. The defendants contend that the plain language of § 21.16 evinces that it was included in the PSA to give LIPA authority and control over when GENCO could initiate challenges to the taxes on its properties. The existence of a disagreement about the plain meaning of the words does not necessarily render those words ambiguous for the purpose of construing the agreement (Rosenthal v Quadriga Art, Inc., 69 AD3d 504, 506). Accordingly, the court will begin its analysis with the language of the PSA and § 21.16.
The PSA was only one of a series of agreements that effectuated LIPA's takeover and acquisition of LILCO. Its purpose was to provide the terms and conditions for the sale and delivery of electricity from GENCO, the owner of the power plants, to LIPA, the owner of the transmission and distribution facilities. Those terms included monthly payments to GENCO for the electricity that it delivered to LIPA. One of the monthly payments that LIPA made to GENCO was the Monthly Capacity Charge, which compensated GENCO for the fixed costs of generating electricity including, inter alia, income taxes, property taxes, and all other taxes (§ 8.1.1). Thus, LIPA was paying the taxes on GENCO's properties. § 21.16 allowed GENCO, in its sole discretion, to challenge the property taxes paid by LIPA under certain limited circumstances: 
"After the Contract Date, GENCO, in its sole discretion, may challenge any property tax assessment on its Generating Facilities or Generating Facility Sites only if the assessment on any such challenged facilities is increased not in an appropriate proportion to the increase in value related to taxable capital additions affixed to the tax parcel between the last two tax status dates. If the tax attributable to the assessment on the Generating Facilities or Generating Facilities Sites is not included in the costs paid by LIPA or its Affiliates (e.g., gas facility located on Generating Facility site) then GENCO, in its sole discretion, may pursue tax challenges on such assessments. This provision shall expire upon the termination of this Agreement."
Under New York law, there is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption (Chimart Assoc. v Paul, 66 NY2d 570, 574). Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing (Schmidt v Magnetic Head Corp., 97 AD2d 151, 157). In construing the provisions of a contract, ascertainment of the intention of the parties is paramount, and due consideration must be given to the purpose of the parties in entering into the contract (Id.). When the intention of the parties is clearly and unambiguously set forth in the agreement itself, effect must be given to the intent as indicated by the language used without regard to extrinsic evidence (Id.). The express provisions prevail over the conclusory allegations of either party, whose subjective intent is irrelevant (Id., Hudson-Port Ewen Assocs. v Kuo, 165 ADd2d 301, 305, affd 78 NY2d 944). 
Reading the PSA as a whole to determine the purpose and intent of § 21.16 (W.W.W. Assocs., Inc., v Giancontieri, 77 NY2d 157, 162), the court finds that § 21.16 was included in the PSA because LIPA, the entity paying the taxes, sought to control when GENCO, the owner of [*11]the properties, could initiate tax challenges. The Monthly Capacity Charge transferred the burden of paying the property taxes from GENCO, the owner, to LIPA. Article 7 of the Real Property Tax law confers upon "aggrieved" persons standing "to review an assessment of real property" (RPTL 704 [1]; 700 [1]; Matter of Steel Los III/Goya Foods Inc. v Board of Assessors of County of Nassau, 10 NY3d 445,452). A person is "aggrieved" when an assessment has a direct adverse effect on his or her pecuniary interests (Id.) The owner of real property is presumptively an "aggrieved" person within the meaning of RPTL article 7 (Folklane Hotel Assocs. v Board of Assessors of Town of Smithtown, 170 Misc 2d 712, 716). 
Both LIPA and GENCO had standing to challenge the property taxes on the power plants owned by GENCO. LIPA had standing because it was the entity paying the taxes (Matter of Long Island Power Authority v Assessor of the Town of Huntington, ___AD3d___, 2018 NY Slip Op 05679 [2nd Dept]), and GENCO had standing because it was the owner of the properties. Thus, either one could challenge the taxes without the other's approval or consent. The court finds that § 21.16 was intended to remedy that situation by creating a contractual right that gave LIPA, the party actually paying the taxes, an opportunity to prevent GENCO from initiating tax challenges if LIPA did not deem such challenges appropriate at the time. § 21.16 did not prohibit GENCO from challenging all taxes on its properties, but restricted GENCO's ability to do so in its sole discretion. Thus, LIPA's approval and consent was required unless GENCO was paying the taxes on the property or, if LIPA was paying the taxes, the assessment was increased "not in an appropriate proportion to the increase in value . . . between the last two tax status dates."
The plaintiffs contend that the language of § 21.16 did not expressly provide that LIPA had decision-making authority over when to initiate tax-certiorari proceedings on GENCO properties. The plaintiffs' interpretation of § 21.16, however, gives no effect to the phrase "in its sole discretion," rendering it meaningless. The court is required to read the agreement as a whole, to give full meaning and effect to all of its material provisions, and not to render any portion thereof meaningless (CNR Healthcare Network, Inc. v 86 Lefferts Corp., 59 AD3d 486, 489). Words should not be considered as if isolated from their context, but in light of the obligation as a whole and the intention of the parties. A sensible meaning of the words should be sought (RM Realty Holding Corp. v Moore, 64 AD3d 434, 436). Applying these principles, the court finds that the only sensible meaning of the phrase "in its sole discretion" is that it gave to GENCO the authority to challenge property taxes without LIPA's approval and consent only if the challenge fell within one of the two enumerated situations. In all other circumstances, LIPA had a contractual right to veto the challenge.
That the plain meaning of § 21.16 evinces that it was included in the PSA to give LIPA a contractual veto over GENCO's ability to challenge the taxes on GENCO properties is consistent with the deposition testimony of Seth Hulkower, LIPA's Executive Director. Unlike Richard Kessel, Hulkower was directly involved in the negotiation of the Definitive Agreements, including the Power Supply Agreement. He testified that § 21.16 was included in the PSA to limit the tax certioraris that LILCO and GENCO could file on their own initiative. He testified that LIPA wanted to ensure that LILCO not "create mischief" and start initiating tax claims at [*12]times that LIPA did not want LILCO to initiate such claims.[FN14]
When asked what he meant by "creating mischief," he replied, "The leadership of LILCO at the time was extremely aggressive in their approach toward tax claims. And the concern was that the [delicate] negotiations primarily surrounding the Shoreham tax settlement would be upended by anything that LILCO tried to do." Hulkower testified that LIPA wanted to make sure that LILCO and GENCO did not file tax certioraris on their own initiative before the transaction closed, while regulatory approvals were being sought.
Stanley Klimberg, LIPA's General Counsel, was also directly involved in the negotiation of the Definitive Agreements, including the Power Supply Agreement. Klimberg testified that the intent of the PSA was to limit the circumstances under which LILCO and GENCO could initiate tax-certiorari proceedings in the future:
"LIPA wanted to make sure that LILCO could not initiate tax certiorari proceedings except in limited circumstances specified in the agreement, and LIPA wanted to make sure that it would decide whether to bring future tax certiorari proceedings and retain the right to direct LILCO to bring tax certiorari proceedings outside of the limitations specified in the agreement and retain the right to bring them if it believed that it was in the interest of its ratepayers.
* * *
"LIPA and LILCO recognized that LILCO had a strong [financial] interest in bringing tax certiorari proceedings. And so the Power Supply Agreement was intended to limit LILCO or GENCO's rights on its own to bring those proceedings, notwithstanding its financial interest, and left to LIPA the authority to authorize or direct LILCO to bring those proceedings or to bring them on its own when it considered it to be in its interests.
* * *
"LIPA is ultimately responsible for payment of the property taxes on the plants and it had an interest in assuring that its ratepayers, through reimbursements to LILCO or GENCO, paid no more than was appropriate under the law."
Ronald Macklin was in-house counsel for LILCO and assigned to the team responsible for negotiating and drafting the PSA. In an affidavit dated December 20, 2017, he averred that § 21.16 was included in the PSA to allow LIPA to control the tax-certiorari decision-making process: 
"[I]t was my understanding that LIPA would control the decision whether to file tax certiorari proceedings challenging the assessments on the Generating Facilities. This was consistent with LIPA's obligation under the Original PSA to pay the property taxes on the Generating Facilities. As the party responsible for the payment of property taxes, LIPA retained the right to direct [GENCO] to commence tax certiori proceedings or to commence such proceedings on its own behalf whenever LIPA determined that it was appropriate and in the best interest of its ratepayers.
"However, pursuant to [§ 21.16, GENCO] did retain limited rights to commence tax certiorari proceedings without LIPA's direction under certain circumstances."
Hulkower, Klimberg, and Macklin were all directly involved in the negotiation of the PSA on behalf of the respective parties thereto, LIPA and GENCO. Their understanding of the parties' intent regarding § 21.16 of the PSA is, therefore, entitled to great weight. The plaintiffs were not parties to the PSA, nor were they involved in the negotiation and drafting of the PSA. Moreover, all of their attempts to get the language of § 21.16 rewritten to be more favorable to them were unsuccessful. The contention by the plaintiffs that § 21.16 was included in the PSA for their benefit and for the benefit of other school districts and municipalities whose tax revenues might be adversely affected by LIPA's takeover of LILCO, is self-serving, unsupported by the plain language of § 21.16, and flatly contradicted by Hulkower, Klimberg, and Macklin. Macklin, in particular, stated in his affidavit, "[GENCO] did not intend to confer any benefit upon Plaintiffs by way of [§ 21.16]." 
The Third-Party-Beneficiary Issue
Despite the overwhelming evidence in the record that § 21.16 was included in the PSA to limit when GENCO could challenge the taxes on its properties without LIPA's approval or consent, the plaintiffs contend that they are intended third-party beneficiaries of § 21.16. Much of the plaintiffs' third-party-beneficiary argument focuses on the circumstances surrounding LIPA's takeover of LILCO as evidenced by the Extra-Contractual Promises. The plaintiffs urge the court to consider the Extra-Contractual Promises to find that they are intended third-party beneficiaries of § 21.16.
While a third party may sue as a beneficiary on a contract made for its benefit, an intent to benefit the third party must be shown (Port Chester Elec. Constr. Corp. v Atlas, 40 NY2d 652, 655). Absent such an intent, the third party is merely an incidental beneficiary with no right to enforce the particular contract (Id.). The Court of Appeals has sanctioned a third party's right to enforce a contract in two situations: (1) when no one other than the third party can recover if the promisor breaches the contract or (2) when the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party (Fourth Ocean Putnam Corp. v Interstate Wrecking Co., 66 NY2d 38, 45). Neither is applicable here. As to the first ground, the plaintiffs are not the only ones who can recover for a breach of § 21.16 of the Power Supply Agreement. LIPA, as the contracting party, may bring its own breach-of-contract claim,[FN15]
and the record provides ample evidence as to why LIPA would choose to enforce § 21.16. As to the second ground, the Power Supply Agreement does not expressly name the plaintiffs as intended third-party beneficiaries, nor does it authorize the plaintiffs to enforce any obligations thereunder (Dormitory Authority of the State of New York v Samson Construction Co. (30 NY3d 704, 710). In fact, the Power Supply Agreement expressly provides in § 21.17 that it shall "bind and inure to the benefit of the parties hereto and any successor or assignee acquiring an interest hereunder . . . ." The plaintiffs are not parties to the PSA, nor are they successors or assignees thereunder. 
In applying the general test established by the Court of Appeals, the Appellate Divisions have expressed somewhat disparate views on how the surrounding circumstances should shape a [*13]party's status as an intended third-party beneficiary of a contract (George Bundy Smith and Thomas J. Hall, Determining Third-Party Beneficiary Status, NYLJ, April 18, 2014). The First Department has held that the parties' intent to benefit the third party must be apparent from the face of the contract (Id.). Thus, in the First Department, absent contractual support, a court should not rely solely on the surrounding circumstances to determine if a party is an intended beneficiary of a contract (Id.). The Second, Third, and Fourth Departments, on the other hand, have allowed courts to look at the circumstances surrounding a contract's formation to determine a party's status as a third-party beneficiary (Id.). Those Departments appear to agree that the obligation or rights to the third party need not expressly appear in the contract (Id.). The Second Department, in particular, has consistently stated that, in determining third-party beneficiary status, it is permissible for the court to look at the surrounding circumstances, as well as the agreement, and that the obligation to perform to the third party need not be expressly stated in the contract (Id.).
This court relied on the Second Department's precedent in 2013 when it denied, in part, the defendants' motion to dismiss the complaint (Board of Educ. of the Northport-E. Northport Union Free Sch. Dist. v Long Is. Power Auth., 39 Misc 3d 1232[A], 2013 NY Slip Op 50860[U], affd 130 AD3d 953). It found that, although the overall purpose of the Power Supply Agreement was the purchase and delivery of power, which benefitted the parties to the contract and LIPA's ratepayers, § 21.16 benefitted neither the parties to the contract nor the ratepayers. Moreover, the Northport-East Northport School District had produced evidence to support its contention that § 21.16 was included in the Power Supply Agreement for its benefit (Id. at *4).[FN16]
 Accordingly, the court declined to dismiss the third-party-beneficiary claims. 
Contrary to the plaintiffs' contentions, this court's previous decision is not the law of the case. The doctrine of law of the case is inapplicable when, as here, a summary judgment motion follows a motion to dismiss since the scope of review on the two motions differ (see, Friedman v Connecticut Gen. Life Ins. Co., 30 AD3d 349, affd as mod 9 NY3d 105). A motion to dismiss examines the sufficiency of the pleadings, while summary judgment examines the sufficiency of the evidence underlying the pleadings (Id. 349-350). There has been extensive discovery in this case since the court determined the motion to dismiss, and the record is now fully developed. The court, therefore, has a more complete understanding of the intent of the parties when they entered into the Power Supply Agreement. Moreover, the Second Department case law upon which the court relied in its previous decision has been called into doubt.
The Court of Appeals recently reaffirmed its holding in Fourth Ocean with regard to third-party beneficiaries. In Dormitory Authority of the State of New York v Samson Construction Co. (supra), the Court of Appeals reiterated that a third-party has the right to enforce a contract in two situations: (1) when the third party is the only one who can recover for the breach of contract or (2) when it is otherwise clear from the language of the contract that there was an intent to permit enforcement by the third party. Dormitory Authority arose out of a construction project to build a forensic biology laboratory in Manhattan for use by the Office of [*14]the Chief Medical Examiner (OCME). The City of New York (on behalf of OCME) and the Dormitory Authority (DASNY) entered into a project-management agreement, which provided that DASNY would finance and manage the design and construction of the laboratory. DASNY entered into a contract with the architect. DASNY and the City of New York (the "City") subsequently sued the architect for breach of contract and negligence. One of the questions that the Court of Appeals decided was whether the City was an intended third-party beneficiary of the contract between DASNY and the architect. The Court answered that question in the negative. The Court held that, even though the parties were aware that the laboratory was being built for OCME's use, neither ground set out in Fourth Ocean existed for finding that the City was an intended third-party beneficiary of the contract between DASNY and the architect. The City was not the only entity that could recover under that contract. In fact, DASNY, the contracting party, had brought its own breach-of-contract claim against the architect. Moreover, the contract did not expressly name the City as an intended third-party beneficiary, nor did it authorize the City to enforce any obligations thereunder. Accordingly, the Court granted the architect's motion for summary judgment and dismissed the City's breach-of-contract claim against the architect.
Judge Rivera's dissenting opinion in Dormitory Authority found that the majority's standard was perilously close to requiring that a contract expressly name a nonparty as a third-party beneficiary. Judge Rivera agreed with the Appellate Division that there was an issue of fact as to whether the City was an intended third-party beneficiary of the contract between DASNY and the architect. The contract expressly stated that a City agency would operate the laboratory, and the City retained control over various aspects of the project. Moreover, the contract stipulated that the City was an insured on the architect's general liability insurance policy and that the architect would indemnify and hold DASNY and "the Client" harmless against all claims arising out of the architect's negligence or failure to act. Those factors, and others, suggested to Judge Rivera that the architect knew the City was the project's intended beneficiary.
Notably absent from the Court of Appeal's majority opinion in Dormitory Authority is any discussion of the surrounding circumstances. Unlike the dissenting opinion by Judge Rivera, the majority opinion only considered the two grounds set forth in Fourth Ocean for determining whether a third party has a right to enforce a contract, noting that, in the absence of express language, third parties are generally considered mere incidental beneficiaries (30 NY2d at 710). Only one conclusion can be drawn therefrom: that courts should no longer consider the surrounding circumstances in determining who qualifies as an intended third-party beneficiary of a contract.
Even before Dormitory Authority was decided by the Court of Appeals, consideration of the surrounding circumstances alone was insufficient to determine who qualified as an intended third-party beneficiary of a contract in the Second Department, and some additional support in the agreement was needed. As previously noted, in determining third-party beneficiary status, the Second Department allowed courts to look at the surrounding circumstances, as well as the agreement, although the obligation to perform to the third party did not need to be expressly stated in the contract (Determining Third-Party Beneficiary Status, supra [emphasis added]; Encore Lake Grove Homeowners Assn., Inc. v Cashin Assocs., 111 AD3d 881, 882). On a few occasions, the Second Department even agreed with the First Department that the parties' intent to benefit the third party must be apparent from the face [*15]of the contract (East Coast Athletic Club, Inc. v Chicago Tit. Ins. Co., 39 AD3d 461, 463, citing LaSalle Natl. Bank v Ernst & Young, 285 AD2d 101, 108 [1st Dept]; see also, Perfetto v CEA Engrs., P.C., 114 AD3d 835, 836; Matter of White Plains Plaza Realty, LLC v Cappelli Enters., Inc., 108 AD3d 634, 637). 
The court has already determined that the plain meaning of § 21.16 evinces that it was included in the PSA to give LIPA a contractual veto over GENCO's ability to challenge the taxes on GENCO properties and that the PSA does not evince an intent to confer a benefit on the plaintiffs and other similarly situated school districts and municipalities (see infra). Under both Dormitory Authority and earlier Second Department case law, consideration of the surrounding circumstances, as evidenced by the Extra-Contractual Promises, without any contractual support therefor is insufficient to support a finding that the plaintiffs were intended third-party beneficiaries of § 21.16. In addition, consideration of the Extra-Contractual Promises would require improper consideration by the court of parole evidence. As one commentator recently noted:
"Circumstances are important in creating a third-party beneficiary. Contract terms can limit such evidence. If [a] contract is integrated, the parol evidence rule should bar evidence of pre-contract negotiations concerning a third-party beneficiary. A GOL § 15-301 contract term would also bar evidence of subsequent oral modification" (Eugene H. Goldberg, A Study in Intention: Contract Third-Party Beneficiaries and Duplicative Causes Against an Architect, NYLJ, May 24, 2018).
A completely integrated contract bars the introduction of extrinsic evidence to vary or contradict the terms of the writing (Primex Intl. Corp. v Wal-Mart Stores, 89 NY2d 594, 599-600). A merger clause accomplishes this objective by establishing the parties' intent that the agreement is to be considered a completely integrated writing (Id.). A merger clause typically contains language that the agreement represents the entire understanding between the parties (Id. at 599). Its purpose is to require full application of the parol evidence rule (Id.). Thus, evidence of prior or contemporaneous communications during the negotiation of an agreement that contradict, vary, or explain the written agreement are precluded when the written agreement is clear and unambiguous and expresses the parties' entire agreement and intentions (Vivir of LI, Inc. v Ehrenkranz, 127 AD3d 962, 964). Moreover, it is not permissible to introduce extrinsic evidence to show that an ambiguity exists (Schmidt v Magnetic Head Corp., 97 AD2d 151, 157, 164). 
The Power Supply Agreement contains a merger clause, "This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof" (§ 21.1). The court has already found that § 21.16 of the Power Supply Agreement is clear and unambiguous and that it does not bestow any enforceable third-party-beneficiary rights on the plaintiffs (see infra). The parole evidence rule, therefore, prevents the Extra-Contractual Promises that were made prior to execution of the PSA from being used to vary or contradict the clear terms of § 21.16 to create third-party beneficiary rights. They may not be used to create ambiguity either. 
The Power Supply Agreement also contains a GOL § 15-301 contract term, "No amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by duly authorized representatives of both Parties" (§ 21.6). Under New York law, when a contract requires any amendments to be evidenced by a writing signed by the parties, oral [*16]modifications to the contract are prohibited (General Obligations Law§ 15-301 [1]; Indus. Window Corp., 609 F Supp 2d 329, 339 [SDNY]). Moreover, when a contract provides a procedure for amending the contract's provisions, that procedure must be followed to execute a valid amendment (BNP Paribas Mtge. Corp. v Bank of Am., N.A., 778 F Supp 2d 375, 411 [SDNY]). None of the Extra-Contractual Promises that were made after execution of the PSA are evidenced by a writing signed by duly authorized representatives of both LIPA and GENCO. Accordingly, they cannot be used to modify § 21.16 to create third-party beneficiary rights. 
In any event, even if the court were to consider the Extra-Contractual Promises, they are too indefinite and too inconsistent to create enforceable third-party beneficiary rights. Kessel stated on different occasions, inter alia, that LIPA, LILCO, and/or National Grid would withdraw all of its then-pending tax certiorari cases and not initiate any future tax-certioraris unless taxes were "unfairly increased," "increased differently than other properties within the town," "raised disproportionately to other tax parcels," increased "separate and apart from other properties located within the town," or the increase was "so outrageous that it was something that LIPA was singled out." None of those phrases has a precise meaning; they vary widely, and they do not accurately reflect the language of § 21.16. Notably absent from § 21.16 is any language about the withdrawal of pending tax-certiorari cases. Also absent is any language about tax increases being disproportionate compared to increases on other properties or other tax parcels. What the language of § 21.16 actually says is that GENCO may challenge the increase if it is not in "proportion to the increase in value related to taxable capital additions affixed to the tax parcel between the last two tax status dates." That language contradicts Kessel's promises that capital improvements "would not warrant certiorari challenges" and "would not allow for the refiling of a tax certiorari case."
Most of the Extra-Contractual Promises were made by Kessel, who was not directly involved in the negotiation and drafting of the Power Supply Agreement. They were gratuitous promises for which there was no consideration. They, therefore, did not contractually bind LIPA. They also did not bind GENCO or National Grid since Kessel was not authorized to act or speak for those entities.[FN17]
Accordingly, the court finds that the Extra-Contractual Promises are best characterized as statements of LIPA's policy with regard to tax-certiorari matters and how LIPA planned to exercise its contractual veto power. Kessel even referred to them as "policy" in his letter to the Huntington Town Supervisor dated August 6, 1997. Statements of policy are not contractually binding and may change from one administration to another. They do not create enforceable third-party-beneficiary rights. 
In view of the foregoing, the court finds that the plaintiffs are only incidental beneficiaries of § 21.16 of the Power Supply Agreement with no right to enforce it.
Finally, even if the plaintiffs were intended third-party beneficiaries of § 21.16, there was [*17]no breach of § 21.16 by LIPA, GENCO, or National Grid.[FN18]
First, all of the promises in § 21.16 ran from GENCO to LIPA. LIPA made no promises in § 21.16, and § 21.16 imposed no limits or conditions on LIPA vis-a-vis tax challenges. Seth Hulkower, LIPA's Executive Director, testified that § 21.16 did not preclude LIPA from filing tax certioraris. In fact, nothing in the Power Supply Agreement, the Agreement and Waiver, or the Amended PSA prevented LIPA from initiating tax challenges. Second, in 2007, LIPA, GENCO, and National Grid entered into the Agreement and Waiver, which modified § 21.16. They agreed in § 11 of the Agreement and Waiver that, for the remaining term of the PSA, National Grid and GENCO would not initiate any tax-certiorari proceedings on GENCO generating facilities "unless directed to do so by LIPA." Richard Kessel, testified at a committee meeting of the Suffolk County Legislature on May 9, 2007, that, under the Agreement and Waiver, "National Grid will not be able to challenge on the tax certiorari end without our approval." Tax-certiorari proceedings were commenced by LIPA and National Grid beginning in 2010. GENCO did not commence any tax certioraris; there were no contractual restrictions on LIPA's ability to commence tax-certioraris, and the record does not reflect that National Grid failed to obtain LIPA's approval before commencing tax-certioraris. Accordingly, there was no breach of § 21.16 by LIPA, GENCO, or National Grid. 
Termination of the PSA and the Amended PSA
The defendants contend that any alleged third-party-beneficiary rights the plaintiffs may have had expired with the expiration of the PSA in 2013, that the Amended PSA expressly negates any such rights, and that there were no restrictions on the defendants' ability to commence tax-certiorari proceedings after 2013. The plaintiffs contend that the defendants violated their alleged third-party-beneficiary rights and breached § 12.1 of the PSA by not including § 21.16 in the Amended PSA. Although the court has already determined that the plaintiffs were not intended third-party beneficiaries of § 21.16, it will address this issue in order to providing the parties with a full and complete determination. 
The Power Supply Agreement terminated on May 28, 2013, at the end of its 15-year term, and the Amended PSA took effect for another 15 years. The Amended PSA was not merely an extension of the terms of the original Power Supply Agreement, but an entirely new agreement with entirely renegotiated terms. It allowed GENCO to challenge the property-tax assessments on its generating facilities, where appropriate, and to prosecute such challenges diligently and in good faith (§ 12.2). It required GENCO to consult with LIPA only before entering into any settlement of a property-tax challenge that might reasonably be expected to affect LIPA's property-tax payment obligations (§ 12.2). Moreover, it specifically stated that neither party "shall have any obligation to any third party as a result of this Agreement (§24.10)."
Contrary to the plaintiffs' contentions, LIPA and GENCO were under no obligation to include in the Amended PSA the language of § 21.16 of the original Power Supply Agreement. § 21.16 specifically provided that it "shall expire upon the termination of this Agreement." While "termination" was not a defined term in the Power Supply Agreement, the "Term" of the Agreement was defined in § 12.1 as follows:
"The Term of this Agreement shall commence on the Closing Date and . . . shall remain in full force and effect for an initial term of fifteen (15) years from such Closing Date. At the end of the Term of this Agreement, LIPA may renew this Agreement, for all capacity upon which it has not exercised its Ramp Down Option, under substantially the same terms and conditions as set forth herein, including but not limited to the continuation of a Ramp Down Option. This Agreement . . . shall terminate upon the purchase of the Generating Facilities by LIPA . . . ."
The Power Supply Agreement could also be terminated by either party for cause. LIPA did not purchase the Generating Facilities, and neither party terminated the PSA for cause. The PSA, therefore, terminated at the end of its 15-year term, at which point LIPA had the option of renewing it "under substantially the same terms and conditions." The renewal language was permissive ("LIPA may renew this Agreement"), not mandatory. The parties were, therefore, free to renegotiate an entirely new agreement, which they did. The new agreement did not include § 21.16 and explicitly provided that there were no third-party beneficiaries thereto. Since the plaintiffs were not intended third-party beneficiaries of the original Power Supply Agreement, there were no third-party beneficiary rights that needed to be preserved in the Amended PSA (see generally, Restatement [Second] of Contracts§ 311). Moreover, the court finds that the phrase "under substantially the same terms and conditions" refers to the immediately preceding phrase, "for all capacity upon which [LIPA] has not exercised its Ramp Down Option," and not § 21.16 as the plaintiffs contend. Accordingly, there was no breach of § 12.1 of the PSA.

Promissory Estoppel
The plaintiffs raise promissory estoppel as an alternative theory to their breach-of- contract and third-party-beneficiary claims to hold the defendants liable for their purported failure to honor the promises made in § 21.16 of the PSA and the Extra-Contractual Promises. 
Promissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice when some contract formation problem, such as the statute of frauds or a failure of consideration, would otherwise prevent enforcement (BNP Paribas Mtge. Corp. v Bank of Am., N.A., 949 F Supp 2d 486, 517 [SDNY]). It is reserved for a limited class of cases where it would be unconscionable not to enforce the agreement (IMG Intl. Mktg. Group, Inc. v SDA William St., LLC, 32 Misc 3d 1233 [A] at *4 [and cases cited therein]). Third parties who are not intended beneficiaries of a contract can assert a promissory-estoppel claim in only the rarest of situations (Henneberry v Sumitomo Corp. of Am., US Dist Ct, SDNY, Apr. 27, 2005, Leisure, J. [2005 WL 991772 at *5-*6]). Promissory estoppel does not apply when, as here, commercially sophisticated third parties have already been found to lack standing to enforce, or rely on, the contract language upon which the promissory-estoppel claim is predicated (BNP Paribas Mtge. Corp. v Bank of Am., N.A., supra).[FN19]

In any event, the court finds that the plaintiffs have failed to establish their promissory-estoppel claim as a matter of law. To succeed, the plaintiffs must establish (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance, and (3) an unconscionable injury sustained in reliance on the promise (IMG Intl. Mktg. Group, Inc. v SDA William St., LLC, supra).
The plaintiffs have failed to establish that their reliance on § 21.16 was reasonable. The record reflects that the plaintiffs were aware that the language of § 21.16 did not accurately reflect the Extra-Contractual Promises that had been made. The plaintiffs communicated with various public officials, including Richard Kessel and others at LIPA, expressing concern about the language of § 21.16, seeking reassurances, and seeking assistance in getting the language changed. Their communications indicate that the plaintiffs knew they could not rely on § 21.16 as drafted. Moreover, the plaintiffs were advised by Special Counsel Allan Hyman and Lorraine Deller of the NSSBA, inter alia, that the language of § 21.16 did not adequately protect their tax base, that it did not preclude future tax challenges, and that they should expect large decreases in their tax receipts.
Insofar as the plaintiffs seek to enforce the Extra-Contractual Promises, the court has already determined that those promises were too inconsistent and too indefinite to be enforceable. They, therefore, do not constitute a clear and unambiguous promise. Moreover, any reliance by the plaintiffs on the Extra-Contractual Promises after 2010, and especially after 2013, was unreasonable. Once the first tax certioraris were filed in 2010, the plaintiffs were put on notice that the defendants had changed their policy and that they would no longer abstain from challenging taxes on GENCO properties. After the PSA expired in 2013, the Amended PSA expressly provided that neither party had any obligation to third parties. The Towns of Huntington and Port Jefferson, where the plaintiff school districts are located, even acknowledged that the agreement between LIPA and National Grid to refrain from challenging taxes expired in 2013.
In view of the foregoing, the court finds that no unconscionable injury or injustice will result in allowing the defendants to proceed with their tax-certiorari claims.
CONCLUSION
In sum, the defendants are entitled to judgment as a matter of law. The plaintiffs are not intended third-party beneficiaries of the Power Supply Agreement. They, therefore, may not enforce § 21.16. Even if they could, there was no breach of the Power Supply Agreement, and promissory estoppel does not apply. The Extra-Contractual Promises may not be used to vary, contradict, or modify the terms of the PSA. Moreover, they are too vague and indefinite to be enforceable, and any reliance on them was unreasonable. They are, at best, statements of policy, which do not contractually bind the defendants. Accordingly, the motion for summary judgment by the defendants is granted, and the cross motion by the plaintiffs for the same relief is denied. The second, fourth, fifth, sixth, seventh, and eighth causes of action, which are for breach of contract, promissory estoppel, and injunctive relief, are dismissed. 
The first and third causes of action seek declaratory relief. When, as here, a plaintiff seeking a declaratory judgment does not succeed, the court is required to declare the rights of the parties and not merely to deny the plaintiff the relief it seeks (see, Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3001:22). A mere dismissal is not appropriate (see, Siegel, NY Prac§ 440, at 770 [6th ed]). Accordingly, the court declares that the defendants may challenge the real-property tax assessments on the power plants situated in the Northport-East Northport and Port Jefferson School Districts. 
It is not necessary to reach the parties' remaining contentions. 
DATED: August 15, 2018
J. S.C.



Footnotes

Footnote 1: LIPA's Chairman at the time was James Gill, who was followed by Frank Zarb. Zarb remained as Chairman until his resignation and replacement by Richard Kessel in April 1997.

Footnote 2: LILCO later transferred the power plants and related facilities to MarketSpan Generation, L.L.C., which transferred them to KeySpan Generation, L.L.C., which transferred them to National Grid Generation, L.L.C.

Footnote 3: PILOT payments, or payments in lieu of taxes, are payments by LIPA equal to the taxes and assessments that LILCO would have paid to municipalities and school districts had there been no takeover (Public Authorities Law§ 1020-q).

Footnote 4: Allan Hyman was retained as Special Counsel to the Northport-East Northport School District in 1996 to represent it in tax-certiorari proceedings filed by LILCO. He also advised the School District on matters relating to the LIPA takeover, including the Power Supply Agreement.

Footnote 5: The PSA defined "Generating Facilities" as "the electric generating facilities owned by [LILCO] as of March 19, 1997," and "Generating Facility Sites" as "each parcel of land upon which each existing Generating Facility is situated, as well as the land contiguous thereto, owned by [LILCO] as of March 19, 1997."

Footnote 6:After the PSA and the other Definitive Agreements were executed, they needed federal and state regulatory approval from, inter alia, the Internal Revenue Service, the Federal Energy Regulatory Commission, the New York Public Authorities Control Board, the New York State Attorney General, and the New York State Comptroller. Once all of the approvals were obtained, the transaction closed on May 28, 1998, and the 15-year term of the PSA commenced (§ 12.1).

Footnote 7: The Ramp Down Option allowed LIPA, beginning in year 7 of the Power Supply Agreement, to reduce the amount of capacity it purchased.

Footnote 8:In tax-certiorari proceedings commenced by LIPA for the 2010-2014 tax years, the Town of Huntington took the position that, although LIPA was paying the taxes, it lacked standing to initiate tax-certiorari proceedings because it was not the owner of the properties. In a decision and order dated September 16, 2015, this court (Bivona, J.) agreed and dismissed the proceedings commenced by LIPA. LIPA appealed. In a decision and order dated August 8, 2018, the Appellate Division reversed finding that, since the PSA required LIPA to pay all of the taxes levied against the properties, the tax assessments directly affected LIPA's pecuniary interest. Thus, LIPA had standing to challenge the assessments (Matter of Long Island Power Authority v Assessor of the Town of Huntington, ___AD3d___, 2018 NY Slip Op 05679 [2nd Dept]). 

Footnote 9: LILCO is referred to as "GENCO" in the Power Supply Agreement. Accordingly, the terms "LILCO" and "GENCO" are used to refer to the same entity in this decision and order.

Footnote 10: In the interest of brevity, the court will refer to the various KeySpan and National Grid entities as "KeySpan" and "National Grid," respectively.

Footnote 11: After this court (Bivona, J.) dismissed the tax-certiorari proceedings filed by LIPA against the Town of Huntington for the 2010-2014 tax years on the ground that LIPA lacked standing to prosecute such claims, National Grid assigned its tax-certiorari claims to LIPA. By a decision and order dated December 12, 2017, this court (Emerson, J.) found that the assignments were valid and that LIPA may prosecute the tax-certiorari proceedings as National Grid's assignee. The Town of Huntington appealed. To date, that appeal is still pending.

Footnote 12:The plaintiffs also rely on statements made by LIPA in filings with governmental agencies such as the Public Authorities Control Board and the Internal Revenue Service and in Official Bond Statements. Those statements are consistent with the language of § 21.16 of the PSA.

Footnote 13: The action has been discontinued against the remaining defendants.

Footnote 14:As previously noted, the terms "LILCO" and "GENCO" are used to refer to the same entity in this decision and order. 

Footnote 15:All of the promises in § 21.16 ran from GENCO to LIPA.

Footnote 16:In 2013, the only school-district plaintiff in this action was Northport-East Northport. The Port Jefferson School District was not added as a plaintiff until 2016.

Footnote 17:Governor Pataki was not authorized to act or speak for LIPA, GENCO, or National Grid. Moreover, some of Kessel's oral promises (that all pending tax certioraris would be withdrawn and "never be restarted now or at any point in the future," for example) are barred by the statute of frauds (General Obligations Law§ 5-701 [a] [1]).

Footnote 18:While National Grid was not a party to the PSA, it is GENCO's successor in interest.

Footnote 19:The plaintiffs are commercially sophisticated. They acknowledge that they enter into legally binding contracts, including collective bargaining agreements; hire teachers and other staff; and finance long-term transactions, among other things. Moreover, they have been and are currently represented by counsel.